******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

IN RE ANAISHALY C. ET AL.*
(AC 41830)
(AC 41889)

DiPentima, C. J., and Keller and Elgo, Js.

*Syllabus*

The respondent parents filed separate appeals to this court from the judgments of the trial court terminating their parental rights with respect to their minor children A and K. The trial court had found, inter alia, that the children came into the custody of the petitioner, the Commissioner of Children and Families, because of the respondents' problems with marijuana use, domestic violence and transience. The court considered the respondents' refusal to submit to substance abuse testing, concerns over domestic violence, and the lack of suitable housing when it concluded that the respondents had failed to achieve a sufficient degree of personal rehabilitation since the Department of Children and Families began providing reunification services to them. *Held*:

1. The respondents could not prevail on their claim that there was insufficient evidence for the trial court to find by clear and convincing evidence that they had each failed to achieve the degree of personal rehabilitation as would encourage the belief that, within a reasonable time, they could assume a responsible position in the lives of the children: the respondents' claim that there was no evidence that their use of marijuana affected their ability to parent was unavailing, as they offered no authority to support their claim that the movement toward legalization of marijuana was relevant to the law the court was required to apply in evaluating the evidence in this case, the respondents' personal history of substance abuse, which had included the illegal use of marijuana, as well as other substances, had properly informed and determined their specific steps, which, in turn, were prerequisites to their own rehabilitation, the current movement and controversy over the legalization of marijuana in the criminal justice context was irrelevant because there is a vast difference in the purpose and application of criminal laws designed to protect the general public as compared to specific steps tailored to parents whose parenting issues are precisely why they had come to the attention of the department and the child protection court in the first instance, and the court properly found that the evidence showed the respondents' significant lack of insight about the correlation between substance abuse and intimate partner violence, as well as their failure to recognize how their use of illegal substances had harmed the children; moreover, the respondents' claim that there was insufficient evidence for the trial court to conclude that they had failed to rehabilitate on the basis of their problems with domestic violence was also unavailing, because although the court did not find that there were any instances of domestic violence since 2016, it was reasonable for the court to infer that the respondent father had not been able to control his temper or anger, and the record indicated that the court did not base its determination regarding failure to rehabilitate solely on the respondents' problems with domestic violence; furthermore, the respondents could not prevail on their claim that their housing situation did not support the trial court's ultimate conclusion that they had failed to rehabilitate, as the respondents' housing situation was one of multiple factors the court considered when it made its decision, and although the respondents were living with the father's mother, there was evidence, which the court credited, to support its conclusion that such housing was neither suitable nor permissible.

2. The respondents could not prevail on their claim that the trial court improperly determined that the termination of their parental rights was in the best interests of the children, which was based on their claim that the court's conclusion was improper in light of its findings that they had made progress in their rehabilitation and that they had a strong bond with the children: that court found that the respondents, despite receiving many supportive services during the lengthy pendency of this matter, did not resolve the serious and chronic problems that resulted

in the children's commitment to the custody of the commissioner, and that the children required the security of a safe and stable, permanent home, which their current placement in a foster home provided to them, and which the respondents remained unable to provide; moreover, although the court found that the respondents had made some progress in their rehabilitation efforts, it also found that despite successfully completing certain programs, the respondents were unsuccessful or noncompliant with others since the department removed the children from their care, and even when there is a finding of a bond between a parent and a child, as the court found in the present case, it still may be in the child's best interest to terminate parental rights.

Argued January 16—officially released June 10, 2019**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to certain of their minor children, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Dyer, J.*; judgments terminating the respondents' parental rights, from which the respondents filed separate appeals with this court. *Affirmed.*

*David J. Reich*, for the appellant in AC 41830 (respondent father).

*Joshua Michtom*, assistant public defender, for the appellant in AC 41889 (respondent mother).

*Rosemarie T. Weber*, assistant attorney general, with whom, on the brief, were *George Jepsen*, former attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee in both cases (petitioner).

*Opinion*

ELGO, J. The respondent mother (mother) and the respondent father (father)[1] appeal from the judgments of the trial court terminating their parental rights with respect to their minor children, Anaishaly C. and Khrianalis C.,[2] and appointing the petitioner, the Commissioner of Children and Families (commissioner), as the statutory parent.[3] The respondents contend that the court improperly concluded that (1) they failed to achieve the requisite degree of personal rehabilitation required by General Statutes § 17a-112, and (2) termination of their parental rights was in the best interests of the children. We affirm the judgments of the trial court.

The following facts, which the trial court found by clear and convincing evidence, and procedural history are relevant to the resolution of this appeal. On August 28, 2012, the father was arrested on charges of assault in the third degree and disorderly conduct after he punched and kicked the mother during an argument at their residence, leaving a boot shaped imprint on her back. The mother was transported to the hospital by ambulance. Although the father told police officers that he had consumed several drinks, the police report noted his ability to articulate his thoughts clearly and calmly. According to the police report, the mother told officers that Anaishaly, who was born in June, 2011, and was fourteen months old at the time, was living with the respondents and had not witnessed the assault. Thereafter, a no contact protective order was issued by the criminal court. The order barred the father from initiating any contact with the mother and required him to vacate the home that they shared.

On October 21, 2014, the mother met with a Department of Children and Families (department) social worker and its domestic violence consultant. At that time, the mother indicated that she was afraid of the father and informed the department about his ongoing abuse. She told the department personnel about the incident that occurred on August 28, 2012, and about another occasion in which the father had choked and had assaulted her, which left a scar on her forehead. On October 22, 2014, after the mother signed a safety plan in which she agreed to have no contact with the father,[4] the department brought her and Anaishaly to a domestic violence shelter. During October, 2014, the mother received drug treatment because she had rendered a positive urine test during a substance abuse assessment.

On October 27, 2014, the department learned that the mother and Anaishaly were no longer at the shelter after a department worker called the cell phone number provided by the mother and the father answered. He stated that he was at work and that the mother was at home with Anaishaly. Later that day, the mother spoke

with a department worker. She reported that she had bipolar disorder, expressed her reluctance to return to the shelter, and recanted the allegations that the father had abused her physically. On that same date, the commissioner assumed temporary custody of Anaishaly, who was then three years old, pursuant to an administrative ninety-six hour hold. On October 30, 2014, the commissioner filed a neglect petition as to Anaishaly and obtained an ex parte order of temporary custody. That order was sustained at a hearing held on November 5, 2014.[5]

At 4:11 a.m. on January 1, 2015, police were called to the respondents' address. The police report indicated that the father had kicked in the front door of the apartment and attempted to punch the mother. Responding officers observed the damaged door, overturned furniture, and other vandalism. The father was not at the scene when the police arrived. The police returned to the residence again at approximately 6 a.m., at which time the mother told the police that she had received a telephone call from the father, who had threatened to "kill her" and "burn down" the apartment. (Internal quotation marks omitted.) The police discovered the father on the premises and arrested him on charges of threatening, criminal mischief, disorderly conduct, and possession of a hallucinogenic substance. The police report noted that the father was "acting like he had consumed some kind of drug(s) and alcohol." Tablets, later identified as the illegal drug ecstasy, were found on the father's person. The police report also noted that the father was combative during booking. On January 2, 2015, another full no contact protective order was issued against the father, which prohibited him from having any contact with the mother and required him to stay 100 yards away from her. He subsequently was convicted of threatening and received a six month suspended jail sentence as a result of this incident.

Anaishaly was adjudicated neglected and committed to the commissioner's custody on February 24, 2015. Thereafter, the department referred both respondents to various rehabilitative services in order to facilitate their reunification with Anaishaly. During 2015, the mother successfully completed an intimate partner violence course, substance abuse treatment, and a parenting education course.

The father's progress reports revealed mixed results. Although a department report received on March 18, 2015, indicated that he had attended all sessions in a parenting education course, he did not appear to gain insight about "how to effectively parent and display an image of a good father to his child." He also received drug treatment, from which he was discharged on September 29, 2015. Although his drug tests were negative on August 3, August 17 and September 28, 2015, he

tested positive for opiates on September 8, 2015, and positive for oxycodone on September 14, 2015. The father claimed that the positive urine tests resulted from his use of his mother's prescription pain killers to treat a back injury. Following his completion of a family violence program on November 17, 2015, the department believed that he made progress in that program.

Khrianalis was born in August, 2015. After being discharged from the hospital, she lived with the respondents. Approximately six months after Khrianalis was born, the department referred the respondents to the Village for Children & Families (Village) for reunification services in an effort to reunify Anaishaly with the respondents and Khrianalis. The Village began providing reunification services on March 3, 2016. On the basis of the respondents' satisfactory participation with the Village, the department returned Anaishaly to the respondents' home on a trial basis on May 31, 2016.

Approximately one month later, on June 28, 2016, neighbors overheard the father cursing at the mother, followed by loud noises coming from the respondents' apartment. Several tenants were concerned that it sounded like the father was physically abusing the mother. A department social worker met with the respondents the next day. Both respondents denied that there had been any physical violence. They told the department social worker that they had not argued but had discussed an accusation that the father had been seen with another woman earlier that day. The department social worker also learned that the mother was pregnant. The department social worker spoke with Anaishaly, who was five years old at the time. Anaishaly reported to the department social worker that she and Khrianalis had stayed the previous night at their paternal grandmother's home. She also reported that she had observed the mother and the father arguing and had observed the father hit the mother. Anaishaly proceeded to describe verbally and physically where and how the father hit the mother, pointing to her left cheek when asked where the mother was hit. She showed an open hand and performed a slapping motion when she was asked how the father hit the mother. In response to Anaishaly's disclosure, "[t]he [respondents] openly blamed Anaishaly for the current situation, saying she has lied about witnessing violence and has lied on a frequent basis."

As a result of this incident, the department returned five year old Anaishaly to foster care on June 29, 2016. On that same date, the commissioner assumed temporary custody of almost ten month old Khrianalis pursuant to an administrative ninety-six hour hold. On July 1, 2016, the commissioner filed a neglect petition as to Khrianalis and obtained an ex parte order of temporary custody. That order was sustained on July 8, 2016. Khrianalis was adjudicated neglected on September 8, 2016.

The children have remained in department foster care continuously from June 29, 2016, to the time of trial and have been placed with their paternal stepuncle, Jose Q., and his domestic partner.

On July 1, 2016, the court issued amended specific steps to the respondents. They were "ordered, inter alia, to cooperate with counseling and gain insight about how domestic violence affects their children; abstain from illegal drugs; submit to random drug testing; submit to substance abuse evaluations and follow treatment recommendations; visit the children as often as permitted; and obtain suitable housing." To facilitate their compliance with the treatment goals and reunification, the department referred the respondents to appropriate services and treatment that focused on their problems with substance abuse, parenting skills, intimate partner violence, and lack of suitable housing.

On November 26, 2016, the mother gave birth to another daughter, Knitzeyalis.[6] Both the mother and the child's meconium tested positive for marijuana. On November 30, 2016, the commissioner obtained an ex parte order granting her temporary custody of Knitzeyalis. That order was sustained by the court at a hearing held on December 9, 2016.[7] Knitzeyalis was adjudicated neglected and committed to the commissioner's custody on January 3, 2017. She has remained in the commissioner's custody and guardianship from the date of her removal through the time of trial and lives with her sisters in the foster home of Jose Q.

As the court indicated in its memorandum of decision, "[e]xtensive evidence was presented during this trial about the [respondents'] varying degrees of cooperation and involvement with services during the past two years." On September 29, 2016, prior to the birth of Knitzeyalis, the department referred the respondents to the Intimate Partner Violence-Family Assessment Intervention Response (IPV-FAIR) program at Community Health Resources. The service provider informed the department that the respondents were discharged from the program on January 3, 2017, due to poor attendance.

On May 5, 2017, the commissioner filed termination of parental rights petitions as to the respondents on behalf of the children. The department had been providing reunification services since October, 2014, when Anaishaly was first placed into foster care at three years old. At the time the petitions were filed, Anaishaly was nearly six years old, and Khrianalis, who was placed in foster care when she was almost ten months old, was twenty months old.

The respondents subsequently reengaged in the IPV-FAIR program on May 22, 2017, and successfully completed it on November 1, 2017. They attended the IPV-FAIR program "regularly, participated consistently in

the sessions, were cooperative, and made progress in the program.'"[8] In a discharge summary dated November 11, 2017, an outreach therapist at Community Health Resources "recommended that [the father] should undergo a mental health assessment and follow treatment guidelines to deal with [the] underlying trauma issues in his life that appear to cause his reactive behavior." The father had not initiated this treatment as of the conclusion of trial.

On October 24, 2017, while the termination of parental rights petitions were still pending, the department referred the family to the Village for a reunification readiness assessment to determine if the children could be safely returned to the respondents' care. Chastity Chandler, who holds a master's degree in social work and is employed as a family support specialist at the Village, was assigned to conduct the thirty day evaluation. She met with the family on eight occasions. She observed four visits between the respondents and the children and also visited the family home four times. The court found that Chandler "credibly reported that [the respondents] actively engaged with the children during the visits and that [the respondents] were capable of meeting the children's basic needs. . . . She credibly testified that the respondents displayed love and affection for the children during these contacts and that a strong bond exists between the [respondents] and their children. . . . Chandler testified credibly that Anaishaly articulated her desire to live with [the respondents]." (Citations omitted.)

Chandler, however, did not recommend reunification. Notwithstanding the pendency of the termination of parental rights petitions, both respondents were noncompliant with random drug testing. The father cooperated with only one out of twelve random drug screens. He did not appear for his first random drug test on September 8, 2017. He submitted a sample that was negative for all illicit substances on September 19, 2017, but he then failed to attend all subsequent random testing sessions. Further, the father told Chandler that he would continue smoking marijuana after the children were returned to his care because he did not believe that using it was harmful. The mother refused to give a urine sample when one was requested on October 25, 2017. Both respondents refused to submit to segmented hair tests.

On November 21, 2017, Chandler held a "closing meeting," which was attended by the respondents and department personnel, where she explained the outcome of the Village's reunification assessment to the respondents. During the meeting, the father became upset, used profanity, made a threat to harm a department social worker, and threatened that he would "blow up" the department office.

After the reunification assessment, in December,

2017, the department asked both respondents to submit to segmented hair drug testing. The mother did not attend scheduled appointments for hair testing on either December 21 or December 26, 2017. A hair sample was collected from the mother on January 2, 2018, which came back negative. The mother admitted, however, that she had used marijuana sometime between Christmas and New Year's Day.[9] The father appeared for testing on December 26, 2017, but because he had cut his hair, he could not provide a testable sample. Between that date and trial, the father had been scheduled for four appointments for hair testing, and he had still not been tested.

The court also found that the respondents failed to secure adequate housing. At the time of the reunification assessment, in the fall of 2017, the respondents were residing in a five bedroom apartment that was leased by the father's mother, who was the recipient of section 8 housing benefits whereby program rules prohibited the respondents from living with her in the apartment. Consequently, the court found that "at the time of the readiness reunification assessment, the [respondents] lacked stable housing for [the children and Knitzeyalis]." In making these findings, the court also found relevant that in February, 2017, the mother was dismissed from a supportive housing assistance program, which provided her with rental assistance, due to noncompliance with program rules. The program allowed for two warnings of noncompliance, and the mother was issued three warnings due to disturbances at the home and her failure to attend meetings.

Through the date of trial, the children resided with their foster parents, their foster parents' two children, and Knitzeyalis. The court found that the children have bonded well with their foster parents and other family members. Although Jose Q. and his domestic partner initially told the department that they would not serve as long-term placement resources, they have since informed the department that they are willing to adopt the children. The court credited a department social study, which opined that the children "need permanent and stable living arrangements in order to grow and develop in a healthy manner."

A trial on the termination of parental rights was held on January 11, April 12 and May 1, 2018. On May 22, 2018, the court terminated the respondents' parental rights and appointed the commissioner as the children's statutory parent. This appeal followed.

I

The respondents first claim that there was insufficient evidence for the trial court to find by clear and convincing evidence that they have each failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time, they

could assume a responsible position in the lives of the children.[10] We disagree.

We begin by setting forth the applicable standard of review and general principles. "The trial court is required, pursuant to § 17a-112,[11] to analyze the [parents'] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . .

"When a child is taken into the commissioner's custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights." (Citations omitted; footnote added; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). "Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate." (Citation omitted.) *In re Elvin G.*, 310 Conn. 485, 507–508, 78 A.3d 797 (2013).

"While . . . clear error review is appropriate for the trial court's subordinate factual findings . . . the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the

appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587–88.

"An important corollary to these principles is that the mere existence in the record of evidence that would support a different conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made." (Emphasis altered.) *In re Jayce O.*, 323 Conn. 690, 716, 150 A.3d 640 (2016).

The court found by clear and convincing evidence that the department's offer and provision of services from 2015 through the end of the trial "constituted reasonable and timely efforts by the department to assist each parent's rehabilitation and to reunify the family."[12] It also found by clear and convincing evidence that the respondents had each "failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering [the] ages and needs of [the children], they could assume a responsible position in the lives of those children." Our review of the record in light of the lengthy recitation of the factual findings made by the court convinces us that the extensive evidence credited by the court supports its determination.

The court found that "[the children] came into [the commissioner's] custody because of [the respondents'] problems with marijuana use, domestic violence and transience. Anaishaly was twice removed from the custody of [the respondents]. She has been committed to the [commissioner's custody] since February 24, 2015. Khrianalis followed her sister into the child protection system on June 29, 2016. Both children have lived in their current foster home since that date." The court concluded "[b]ased on all of the evidence presented . . . that [the respondents] are unable or unwilling to benefit from the extensive assistance that [the department] and other agencies have offered and provided to them while the children's cases have been pending." As the court explained in its memorandum of decision: "[The department] has offered and provided multiple reunification services to [the respondents] on an ongoing basis since October, 2014. These have included men-

tal health counseling, substance abuse evaluations, counseling and testing, parenting education, intimate partner violence programs, supervised visitation, case management, supportive housing assistance, and reunification readiness assessments and services. The court has found that these services were timely and constituted reasonable efforts to reunify the family. The respondents successfully completed some programs, but they were unsuccessful, or noncompliant, with others. One [department] witness offered an apt analogy during her testimony when she likened the twists and turns of this case to a roller coaster ride. There were high points when [the respondents] appeared to be making progress, followed by low points when the [respondents], who were twice assessed for the return of the children, engaged in negative behavior that stopped reunification in its tracks."

In challenging these findings, both respondents argue that there is no evidence that their use of marijuana affected their ability to parent, and that "because the law concerning [the criminalization of] marijuana has changed, this change must also be reflected in the law concerning child protection . . . ." We are not persuaded.

First, the respondents offer no authority to support their claim that the movement toward legalization of marijuana is relevant to the law the court was required to apply in evaluating the evidence in this case. Indeed, our Supreme Court has held otherwise. The court in *In re Shane M.*, supra, 318 Conn. 596 n.23, found "unpersuasive the respondent's claim that, even properly drawn, [the] inference [that he had continued to use marijuana based on his proven past marijuana use and his refusal to submit to drug testing] did not prove that he failed to rehabilitate because criminal penalties for possession of marijuana have been reduced and the legislature has approved the use of marijuana for palliative medical purposes." Our Supreme Court reasoned that, "regardless of marijuana's recent limited legalized status, the respondent was ordered to refrain from using it due to his extensive personal history of substance abuse." Id. Similarly, in the present case, the respondents' personal history of substance abuse, which has included the illegal use of marijuana, as well as other substances, has properly informed and determined their specific steps, which, in turn, are prerequisites to their own rehabilitation. See id.; see also *In re Elvin G.*, supra, 310 Conn. 507–508 ("[s]pecific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights").

Second, there is a vast difference in the purpose and application of criminal laws designed to protect the general public as compared to specific steps tailored to parents whose parenting issues are precisely why

they have come to the attention of the department and the child protection court in the first instance. In the same way that the general public may legally consume alcohol while those who are alcohol dependent may not enjoy the same freedom, less restrictive laws around marijuana use for the general public[13] have no bearing on respondents whose abuse of substances, including marijuana, has required treatment and abstention. The current movement and controversy over the legalization of marijuana in the criminal justice context is simply irrelevant.

Further, the respondents' focus on the legalization of marijuana operates on the assumption that their admissions of marijuana use are credible evidence of the extent of their rehabilitation. Understood in the context of the respondents' failure to cooperate with drug testing, evidence amounting to the respondents' self-report of marijuana use was simply that—a self-serving assessment of their own rehabilitative status—which the court was free not to credit. In fact, the proper measure of their compliance with the requirement that they refrain from abusing substances is in their ability to provide negative and randomized drug testing results over a sustained period of time, which they failed to do. The respondents knew full well that the failure to submit to drug testing violated their specific steps, which, in turn, would impede reunification with their children. Understanding these consequences, and notwithstanding the pending termination petitions, the respondents nevertheless chose not to comply, which the court properly considered in finding that the respondents failed to rehabilitate. In observing that the mother "was also aware that her fitness to resume custody of [the children and Knitzeyalis] was being evaluated when she refused to submit to drug testing in October, 2017," the court gave appropriate weight to this factor when considering whether the respondents were willing and able to reunify with the children.

We simply do not find fault in the court's finding that "the [respondents'] refusal to comply with drug testing during the assessment period, and the father's attitude about continued marijuana use, [was] particularly disturbing. This evidence reveals each parent's significant lack of insight about the correlation between substance abuse and intimate partner violence, as well as their failure to recognize how their use of illegal substances has harmed [the children] and Knitzeyalis."

The respondents also argue that there was insufficient evidence for the court to conclude that they had failed to rehabilitate on the basis of their problems with domestic violence, noting that there were no incidents of intimate partner violence since 2016, and that they had each completed domestic violence programs.[14] We reiterate that, on review, we must determine "whether the trial court could have reasonably concluded, upon

the facts established and the reasonable inferences drawn therefrom, that *the cumulative effect of the evidence* was sufficient to justify its [ultimate conclusion]." (Emphasis added; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 588.

The record indicates that the court did not base its determination regarding failure to rehabilitate solely on the respondents' problems with domestic violence. The court expressed its specific concern with the father's history of domestic violence and the link between at least two of those instances and his use "of alcohol and/ or illegal controlled substances." Although the court did not find that there were any instances of domestic violence since 2016, it was reasonable for the court to infer that the father has not been able to control his temper or anger. The court specifically noted "the similarity between [the father's] conduct on January 1, 2015, when he threatened to kill [the mother] and burn down her apartment, and his behavior on November 21, 2017, when he threatened to cause physical harm to [a department social worker] and blow up the [department] office." That November 21, 2017 incident occurred after the respondents had completed the IPV-FAIR program.

The respondents also argue that their housing situation did not support the court's ultimate conclusion that they have failed to rehabilitate. We again note that we must look at the cumulative effect of the evidence; *In re Shane M.*, supra, 318 Conn. 588; and that the respondents' housing situation was but one of multiple factors the court considered when it made its decision. The court credited the evidence that the respondents cannot legally stay with the children at the home of the father's mother. It concluded that, "[a]s a result, the mother and the father are still without suitable housing for the children . . . [and] this problem might have been solved if the mother had not been discharged due to noncompliance last year from the supportive housing assistance program to which she had been referred by [the department]." Neither respondent challenges the court's factual findings. See footnote 10 of this opinion. Although the respondents were living with the father's mother, there was evidence, which the court credited, to support its conclusion that such housing was neither suitable nor permissible.

The court's memorandum of decision plainly indicates that the court considered the respondents' refusal to submit to substance abuse testing, concerns over domestic violence, *and* the lack of suitable housing when it concluded that the respondents have failed to achieve a sufficient degree of personal rehabilitation since the department began providing reunification services to the respondents, beginning in October, 2014. The record before us contains evidence that substantiates these findings. Accordingly, we conclude that the court reasonably could have determined, on the basis

of its factual findings and the reasonable inferences drawn therefrom, that the respondents failed to achieve sufficient rehabilitation that would encourage the belief that, within a reasonable time, they could assume a responsible positon in the children's lives.

II

The respondents next claim that the court improperly determined that the termination of their parental rights was in the best interests of the children. Specifically, they argue that the court's conclusion was improper because the court found, among other things, that they have made progress in their rehabilitation and that they have a strong bond with the children.[15] We disagree.

We begin by setting forth the applicable standard of review and general principles. "In the dispositional phase of a termination of parental rights hearing,[16] the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)].[17] . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnotes added and altered; internal quotation marks omitted.) *In re Joseph M.*, 158 Conn. App. 849, 868–69, 120 A.3d 1271 (2015).

In the portion of its memorandum of decision where it addressed the dispositional phase, the court reasoned: "The court has given careful consideration to the strong feelings which the [respondents] and the children have for each other. However, the court must examine and weigh this evidence in conjunction with the evidence about the length of time that both children have been in foster care and each parent's lack of progress toward reunification. Anaishaly, who will turn seven in June, [2018], has spent a total of more than three and [one-half] years in the custody of [the commissioner]. Khrianalis, who will be three in August, [2018], has resided for almost [twenty-three] months—or slightly less than two thirds of her life—in a foster home. Based on each parent's inability to sufficiently recognize and remedy the issues that caused the children's removal, and their

failure to substantially benefit from services and treatment, it is impossible to predict when in the future [the children] could be safely returned home. The evidence also established that [the children] are both doing well in their present placement, and that their caretakers have committed to adopting them." The court concluded: "Because of the strong bond that exists between the [respondents] and [the children], it is very appropriate that [the mother] and [the father] were afforded much help and many opportunities to achieve reunification. However, despite receiving many supportive services during the lengthy pendency of this matter, the respondents have not resolved the serious and chronic problems that resulted in the children's commitment to [the commissioner's custody]. [The children] require the security of a safe and stable, permanent home. Their current placement provides this to them. Their biological parents remain unable to offer this to them. The court finds that it would be detrimental to the well-being of these children [to] delay permanency any longer in order to afford the respondents additional time to pursue rehabilitative efforts which have thus far proven unsuccessful." The court also made additional findings as to the seven factors enumerated in § 17a-112 (k) and those findings are supported by the record.

Although the respondents contend that certain positive facts found by the court outweigh the negatives, "we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court." *In re Shane M.*, supra, 318 Conn. 593. The respondents point out that the court found that they had made some progress in their rehabilitation efforts. We will not, however, overlook the court's finding that despite "successfully complet[ing] some programs," the respondents were "unsuccessful, or noncompliant, with others" since the department removed Khrianalis and Anaishaly, for the second time, from their care on June 29, 2016.

Moreover, as to the respondents' contention that the court found that they shared a bond with their children, " '[o]ur courts consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights.' *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006); see also *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004) ('The Appellate Court has concluded that a termination of parental rights is appropriate in circumstances where the children are bonded with their parent if it is in the best interest of the child to do so. . . . This is such a case.' . . .); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718 ('[A] parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to these children because

she cannot provide them a nurturing, safe and structured environment.'), cert. denied, 255 Conn. 950, 769 A.2d 61 (2001)." *In re Melody L.*, 290 Conn. 131, 164, 962 A.2d 81 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014). The existence of a bond, while relevant to the court's analysis, is not dispositive of the best interests determination.

On our careful review of all the evidence, we cannot conclude that the trial court's determination that the termination of the respondents' parental rights was in the best interests of the children was clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** June 10, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We refer to the mother and the father collectively as the respondents.

[2] The mother gave birth to two other children. See footnote 6 of this opinion. We refer to all four children individually by their names, and we refer to Anaishaly and Khrianalis collectively as the children.

[3] We note that pursuant to Practice Book § 67-13, the attorney for the minor children filed a statement adopting the brief of the commissioner in the mother's appeal.

[4] According to a department social worker affidavit, pursuant to the safety plan, the mother agreed to go to the domestic violence shelter, follow the shelter's rules, and follow its recommendations, including those related to advocacy and domestic violence education. The mother also agreed to have no contact with the father and to file a restraining order against him. She further agreed to request advocacy regarding her lease. The department agreed to maintain communication with the mother and shelter staff. It also agreed to continue its assessment and to provide case management services.

[5] The file indicates that the respondents were issued specific steps filed on October 30, 2014, and signed by the respondents on November 5, 2014, which provided, inter alia, that they: participate in counseling and make progress toward the identified treatment goals; not use illegal drugs or abuse alcohol or medicine; submit to random drug testing; cooperate with service providers' recommendations for parenting/individual/family counseling, in-home support services, and/or substance abuse assessment/treatment; get and/or maintain adequate housing and a legal income; and learn about the impact of domestic violence on children.

[6] The respondents' parental rights as to Knitzeyalis are not the subject of this action. The mother also has an older child, Taisha R.G., who was born on December 19, 2007. According to a department social study, from "March 19, 2008, to August, 2009, [the mother] had protective services involvement in Massachusetts due to domestic violence and homelessness/transience." Guardianship of Taisha was transferred from the mother to the child's paternal grandmother in May, 2008. Since that time, Taisha has remained in her paternal grandmother's care.

[7] In its memorandum of decision, the court took judicial notice of the fact that "the court issuing that order of temporary custody made a legal finding that Knitzeyalis was in immediate danger of physical injury from [the] surroundings in the parental home at the time the order was signed."

[8] In addition to the IPV-FAIR program, the mother also successfully completed an "Intimate Partner Violence Group" on September 17, 2016, and a "Positive Parenting & Support Group" on May 20, 2017. (Internal quotation marks omitted.) The mother also completed similar domestic violence programs known as "Integrated Family Violence Services" on dates not specified and "Positive Parenting Education and Support Groups" on July 28, 2015, and September 17, 2016. (Internal quotation marks omitted.)

[9] A clinician at the agency where the testing was conducted testified that

the mother's use of marijuana would likely not have shown on the hair test because of how recently the hair sample was collected relative to the time frame of the mother's reported use of the drug.

[10] We note that the father does not argue that the court's findings are clearly erroneous and, in the mother's appellate brief, she explicitly states that she "does not by the present appeal challenge the trial court's factual findings." Instead, both respondents argue that those findings are insufficient to support the court's ultimate conclusion.

[11] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[12] We note that the respondents do not argue on appeal that the department did not make reasonable and timely efforts to assist in their rehabilitation and reunification with the children.

[13] In her appellate brief, the mother specifically refers to the permitted palliative use of marijuana; see General Statutes § 21a-408a et seq.; and the decriminalization of possession of less than one-half ounce of marijuana. See General Statutes § 21a-279a.

[14] The mother argues that the court cited to a department social study written before she completed the IPV-FAIR program in November, 2017, to support the following findings: "The court finds that the mother lacks understanding about the dynamic of intimate partner violence that exists in her relationship with the father, and how it is harmful to her children. The court finds that there is a substantial likelihood that [the children] would be exposed to acts of domestic violence, or other angry outbursts by [the father] if they were returned to parental custody. The court also finds that [the mother] has not demonstrated that she would be able to shield [the children] from the potential physical and psychological dangers associated with the father's reactive behavior." The mother, however, has not distinctly raised a claim that the court's factual findings were clearly erroneous. To the contrary, she specifically states in her appellate brief that she "does not by the present appeal challenge the trial court's factual findings." Moreover, on the evidence before us, we do not conclude that the court's factual findings were clearly erroneous. "In reviewing the trial court's decision, [b]ecause it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 593 n.20.

We further note that the mother completed the IPV-FAIR program to which she refers in November, 2017, subsequent to the May, 2017 filing of the termination of parental rights petitions. Practice Book § 35a-7 (a) provides: "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." This court "has expanded that rule to *allow* courts to consider events subsequent to the filing date of the petitions in the adjudicatory phase of termination proceedings. Practice Book § 33-3 (a) [now § 35a-7] limits the time period reviewable by the court in the adjudicatory phase to the events preceding the filing of the petition or the latest amendment. . . . In the adjudicatory phase, the court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 494–95, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

[15] The mother also asserts "that there was absolutely no evidence adduced

suggesting that ongoing visits with the [respondents] while the children remained in the sole relative foster placement [that they have] known since removal was having any negative effect on them. . . . Indeed, there was no evidence suggesting that the continuation of the [respondents'] legal rights would affect the children's well-being in any way." (Citation omitted.) This assertion, however, ignores established case law and the fundamental underlying public policy that recognizes the importance of permanency in a child's life. Anaishaly was removed from the respondents' care when she was three years old. Khrianalis was almost ten months old when she was removed from the respondents' care. The children have been in legal limbo since then. At the time the termination of parental rights petitions were filed, Anaishaly was almost six years old and Khrianalis was almost two years old. When the court rendered its decision, Anaishaly was almost seven years old and Khrianalis was almost three years old.

Our appellate courts have "noted consistently the importance of permanency in children's lives. *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 646, 436 A.2d 290 (1980) (removing child from foster home or further delaying permanency would be inconsistent with his best interest); *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's findings were not clearly erroneous where much of child's short life had been spent in custody of [commissioner] and child needed stability and permanency in her life); *In re Teshea D.*, [9 Conn. App. 490, 493–94, 519 A.2d 1232 (1987)] (child's need for permanency in her life lends added support to the court's finding that her best interest warranted termination of the respondent's parental rights). Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 494, 940 A.2d 733 (2008). "Termination of a biological parent's rights, by preventing further litigation with that parent, can preserve the stability a child has acquired in a successful foster placement and, furthermore, move the child closer toward securing permanence by removing barriers to adoption. . . . Even if no adoption is forthcoming, termination can aid stability and lessen disruption because a parent whose rights have been terminated no longer may file a motion to revoke the commitment of the child to the custody of the [commissioner] . . . or oppose an annual permanency plan." (Citation omitted; internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 733, 120 A.3d 1177 (2015).

Evidence before the court supported its findings that the children require permanency, and the court properly considered their need for permanency in its consideration of whether termination was in their best interests. Accordingly, we reject the mother's assertion.

[16] "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 582–83 n.12.

[17] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to

make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

---