******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

IN RE JACOB M.*
(AC 44233)

IN RE NATASHA T. ET AL.
(AC 44237)

Bright, C. J., and Moll and DiPentima, Js.

*Syllabus*

The respondent parents filed separate appeals to this court from the judgments of the trial court terminating their parental rights with respect to the minor children, N and J. N and J are the biological children of the respondent mother and J is the biological child of the respondent father. The petitions were consolidated for trial. *Held*:

1. The respondents could not prevail on their claim that the trial court, relying on an executive order issued by the governor in response to the COVID-19 pandemic, improperly denied their joint motion for a mistrial on the basis of the court's failure to render its judgments within 120 days of the completion of the trial as required by statute (§ 51-183b), as the time limitation in § 51-183b properly had been suspended by the executive order at the time the judgments in the present case were rendered: the General Assembly set forth in statute (§ 28-9) a policy, which the governor followed, that, upon the governor's declaration of a public health emergency pursuant to statute (§ 19-131a), the governor may suspend any statute that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health, and such standards and limitations set forth by the legislature in § 28-9 (b) (1) were followed in the executive order suspending the 120 day requirement set forth in § 51-183b, and a requirement of adherence to a strict time limitation on the rendering of judgments in civil cases at the outset of the COVID-19 pandemic, when there were critical shortages in sanitizer and personal protective equipment, reasonably could have interfered with the health and safety of the judges of the Superior Court and courthouse staff, who reasonably would have had to enter courthouses in order to review materials and to perform tasks necessary for the rendering of civil judgments; moreover, the time limitation set forth in § 51-183b, contrary to the mother's claim, was not jurisdictional, as § 51-183b related to the authority given to the Superior Court to render judgments in civil cases within a certain time frame, and did not pertain to the jurisdiction of the court to decide certain types of cases.

2. The trial court properly concluded that the Department of Children and Families made reasonable efforts to reunify the mother with the minor children, the evidence in the record having supported the court's determination; the department offered the mother many services over a number of years, including mental health treatment, parent mentoring services, visitation services, domestic violence counseling and transportation, as well as substance abuse treatment, and the mother attended a partial hospitalization program and an intensive outpatient program; moreover, although the department suspended visitation on the recommendation of a therapist, on the basis that the visits to the mother, who was at that time incarcerated, caused the children much emotional distress, the department continued its reunification efforts by regularly communicating with the children's therapist to inquire about the children's ability to resume visitation and provided updates to the mother on the children.

3. The trial court properly concluded that the department made reasonable efforts to reunify the father with J, the evidence in the record having supported the court's determination: the department referred the father for substance abuse services to address his admitted opioid dependence, but he did not complete those programs successfully, and the court properly determined that it was not unreasonable for the department not to have referred the father for mental health services when he denied having any mental health concerns; moreover, the department's efforts regarding visitation were reasonable under the circumstances wherein J had negative reactions following visitation, and, although the court suspended visitation, the department communicated with the father

regularly and the department continually contacted the therapist to assess whether resumption of visitation was advisable.

4. The trial court's determination that the termination of the father's parental rights was in the best interest of J was not clearly erroneous, as it was supported by the court's findings and conclusions with respect to the applicable statutory (§ 17a-112 (k)) factors, as well as the court's conclusion regarding J's need for permanency and stability: the father failed to demonstrate, in relying on the therapist's recommendation that the children establish positive memories of their biological parents, that it was not in J's best interest to have the father's parental rights terminated, as the therapist recommended open adoption and did not recommend reunification, the court reasonably found that the father was not prevented from having a meaningful relationship with J due to the unreasonable acts or conduct of another person, specifically, J's foster mother, with whom J had bonded, and J's therapist, but, rather, that it was his own actions that caused him not to have a meaningful relationship with J; moreover, although the father alleged that the department did not make reasonable efforts to reunite him with J, including offering him services to improve his parenting skills or referrals for mental health concerns, the record indicated that the father denied that he had any mental health concerns, the department offered the father timely and appropriate services from the start of the case, and the court determined that the father neither adjusted nor corrected his circumstances to make it in J's best interest to be returned to him.

5. This court declined to review the mother's claim that the trial court improperly denied her motion to intervene, filed after the trial court rendered judgments terminating her parental rights, in which she sought posttermination visitation with the minor children, as the record was inadequate to review this claim because the trial court did not file a memorandum of decision explaining its ruling and the mother did not file a notice pursuant to the applicable rule of practice (§ 64-1 (b)) or a motion for articulation of the court's factual and legal basis for its ruling.

Argued February 18—officially released May 20, 2021**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Middlesex, Juvenile Matters at Middletown, and tried to the court, *Woods*, *J*.; judgments terminating the respondents' parental rights, from which the respondent father of Jacob M. and the respondent mother of Natasha T. et al. filed separate appeals to this court. *Affirmed.*

*Karen Oliver Damboise*, for the appellant in Docket No. AC 44233 (respondent father).

*Albert J. Oneto IV*, assigned counsel, for the appellant in Docket No. AC 44237 (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Clare Kindall*, solicitor general, for the appellee in both cases (petitioner).

*Chris Oakley*, attorney for the minor children in both cases.

*Opinion*

DiPENTIMA, J. In these related appeals, the respondents, mother and father, appeal from the judgments of the trial court terminating their parental rights with respect to their minor children and child, respectively. The respondents both claim that the court improperly (1) denied their joint motion for a mistrial, (2) concluded that the Department of Children and Families (department) made reasonable efforts to reunify them with their children or child and (3) concluded that they were unwilling or unable to benefit from reunification efforts. In Docket No. AC 44233, the father additionally claims that the court improperly concluded that (1) the termination of his parental rights was in the best interest of his son, Jacob, and (2) it lacked the authority to grant posttermination contact. In Docket No. AC 44237, the mother additionally claims that the court improperly denied her postjudgment motion to intervene. We affirm the judgments of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to the resolution of the respondents' claims on appeal. At the time of the court's July 21, 2020 judgments, Natasha, the biological daughter of the mother,[1] was seven years old, and Jacob, the biological son of both respondents, was four years old. In its memorandum of decision, the court found the following. "On November 22, 2016, [the department] received a report alleging physical and emotional neglect of Natasha . . . and Jacob . . . by [the respondents]. Pursuant to the report, [the father] was in a car accident at work and appeared to be under the influence. [The father's] boss then sent a friend to the family residence. . . . The children were found to be naked and soiled. They were brought to the maternal grandparents' home. Police went to the home where the parents admitted to opioid overdoses while caring for the children. At that time the department invoked a ninety-six hour hold on behalf of both children.

"On November 25, 2016, petitions of neglect and motions for orders of temporary custody were filed by [the petitioner, the Commissioner of Children and Families]. The [orders of temporary custody were] . . . granted on November 25, 2016, and sustained on December 2, 2016. The children were adjudicated neglected and committed to [the petitioner] on December 22, 2016. On February 8, 2017, they were sent to live with their mother at the Amethyst House women and children's program. On March 30, 2017, they returned to their apartment. . . . A motion to revoke commitment was filed on May 8, 2017, and commitment was revoked in a hearing on May 11, 2017 . . . . The children were then placed under an order of protective supervision for six months . . . which was extended until December 7, 2017.

"On December 1, 2017, [the mother] failed to attend her criminal court sentencing hearing. A silver alert was issued for Natasha and Jacob as [the respondents] fled with the children. On December 2, 2017, the family was found in a hotel . . . and the [respondents] were arrested. A ninety-six hour hold was invoked and Jacob and Natasha were placed in a nonrelative foster home. An [order of temporary custody] was granted on December 5, 2017, and the children were committed to the [petitioner] on December 13, 2017.

"On September 25, 2018, [the petitioner] filed a permanency plan of [termination of parental rights] and adoption and a termination of parental rights petition [for each child]. Said permanency plan was approved on November 15, 2018. A [termination of parental rights] trial was held in this matter on September 17, 18, 25, and 30, and October 2 and 28, 2019."

In a memorandum of decision filed on July 21, 2020, the court, *Woods, J.*, terminated the parental rights of the mother with respect to Natasha and Jacob, and terminated the parental rights of the father with respect to Jacob. On May 8, 2020, prior to the date of the filing of the memorandum of decision, the respondents filed a joint motion for a mistrial. In that motion, the respondents argued that a mistrial was warranted due to the court's failure to render its judgments within 120 days of the completion of trial in violation of General Statutes § 51-183b. The court, *Woods, J.*, denied the motion on July 30, 2020.

These appeals followed. Additional facts and procedural history will be set forth as necessary.

## I

### SEPARATION OF POWERS

Both respondents claim that the court, relying on an executive order issued by the governor, improperly denied their joint motion for a mistrial because the court had failed to render its judgments within 120 days of the completion of trial as required by § 51-183b. We are not persuaded.

To provide context for the respondents' claim, we discuss the relevant statutes and executive order. Section 51-183b provides in relevant part: "Any judge of the Superior Court . . . who has commenced the trial of any civil cause . . . shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. The parties may waive the provisions of this section." The respondents did not waive the statutory provision, and it is undisputed that the court's July 21, 2020 judgments were rendered more than 120 days after the completion of trial.

On March 10, 2020, prior to the conclusion of the 120 day time limit, the governor issued a declaration of a

"public health emergency and civil preparedness emergency throughout the [s]tate, pursuant to [Connecticut General Statutes §§] 19a-131a and 28-9" in order "to limit the spread of COVID-19" due to the "global pandemic" and the "resulting shortages of personal protective equipment and other supplies that could jeopardize public safety and civil preparedness."

Section 28-9 (b) (1) provides in relevant part : "Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to section 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. . . ."

On March 19, 2020, the governor issued Executive Order No. 7G, which referenced the declaration of a state of emergency and the confirmed spread of COVID-19 in the United States and in Connecticut and which suspended "[n]on-[c]ritical [c]ourt [o]perations and [a]ssociated [r]equirements" in paragraph 2. Specifically, paragraph 2 (c) of Executive Order No. 7G suspended "[a]ll time limitations for rendering judgments in civil actions provided in [§] 51-183b . . . ."

The respondents claim that § 28-9, to the extent that it permits the governor, pursuant to paragraph 2 (c) of Executive Order No. 7G, to suspend the time limitation for rendering civil judgments set forth in § 51-183b, constitutes an unconstitutional delegation of the legislature's lawmaking function. In particular, they contend that the legislature's delegation to the governor of its exclusive lawmaking function to create statutes violates the separation of powers provision of the Connecticut constitution.

Generally, the decision of a trial court to deny a motion for a mistrial is reviewed under an abuse of discretion standard. *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 392, 3 A.3d 892 (2010). In the present case, however, the court's ruling on the motion for a mistrial implicates a constitutional question over which our review is plenary. *Persels & Associates, LLC* v. *Banking Commissioner*, 318 Conn. 652, 668, 122 A.3d 592 (2015). Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another . . . ."

"[T]he primary purpose of [the separation of powers] doctrine is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. . . . It is axiomatic that no branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. . . .

"The separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power. Nevertheless, it cannot be rigidly applied always to render mutually exclusive the roles of each branch of government. . . . [T]he great functions of government are not divided in any such way that all acts of the nature of the function of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative and judicial powers, of necessity overlap each other, and cover many acts which are in their nature common to more than one department." (Citations omitted; internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 551-52, 663 A.2d 317 (1995); see also *Casey* v. *Lamont*    Conn.    ,    , A.3d    (2021).

Article third, § 1, of the Connecticut constitution provides in relevant part that: "The legislative power of the state shall be vested in . . . the general assembly. . . ." "The [lawmaking] power is in the legislative branch of our government and cannot constitutionally be delegated . . . but the General Assembly may carry out its legislative policies within the police power of the state by delegating to an administrative agency the power to fill in the details." (Citation omitted; internal quotation marks omitted.) *New Milford* v. *SCA Services of Connecticut, Inc.*, 174 Conn. 146, 149, 384 A.2d 337 (1977).

"A Legislature, in creating a law complete in itself and designed to accomplish a particular purpose, may expressly authorize an administrative agency to fill up the details by prescribing rules and regulations for the operation and enforcement of the law. In order to render admissible such delegation of legislative power, however, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits, and enjoin a procedure under which, by appeal or otherwise, both public interests and private rights shall have due consideration. . . . If the Legisla-

ture fails to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad, its attempt to delegate is a nullity." (Citations omitted.) *State* v. *Stoddard*, 126 Conn. 623, 628, 13 A.2d 586 (1940). "[T]he *Stoddard* rule clearly is applicable to delegations of authority from the legislative to executive department." *Bottone* v. *Westport*, 209 Conn. 652, 660, 553 A.2d 576 (1989).

Pursuant to the authority given to the governor by the legislature in § 28-9, the governor's suspension in paragraph 2 (c) of Executive Order No. 7G of the time limitation in § 51-183b was not inconsistent with the constitutional principle that the General Assembly cannot delegate its lawmaking power. The General Assembly exercised its legislative power when it decided that the governor could suspend statutes that conflict with civil preparedness or public health upon the governor's ascertaining and declaring of the existence of a particular contingency. See *Marshall Field & Co.* v. *Clark*, 143 U.S. 649, 692–93, 12 S. Ct. 495, 36 L. Ed. 294 (1892); see also *Casey* v. *Lamont*, supra,      Conn.      .

In *Casey*, our Supreme Court held that the plaintiffs, who were the owners of a Connecticut pub that had closed in response to executive orders that were issued due to the COVID-19 pandemic, which pertained to on premise consumption of alcoholic liquor, could not satisfy their heavy burden of establishing that § 28-9 (b) (1) and (7) was an unconstitutional delegation by the General Assembly of its legislative powers to the governor in violation of the separation of powers provision of the Connecticut constitution. Id.,      . Our Supreme Court concluded that, "although the lawmaking power is in the legislative branch of our government and cannot constitutionally be delegated . . . the General Assembly may carry out its legislative policies within the police power of the state by delegating to an administrative agency the power to fill in the details . . . . [T]he General Assembly has the right to determine in the first instance what is the nature and extent of the danger to the public health, safety, morals and welfare and what are the measures best calculated to meet that threat . . . . Once the General Assembly has made that determination, it may carry out that policy by delegating to the executive branch the power to fill in the details in order to effectuate that policy." (Citations omitted; internal quotation marks omitted.) Id.,      .

As stated by our Supreme Court in *Casey*, the General Assembly set forth in § 28-9 the policy that the governor was to follow, namely, that upon the proclamation of a civil preparedness emergency or upon the declaration of a public health emergency pursuant to § 19-131a, the governor may suspend statutes that conflict with the efficient and expeditious execution of civil preparedness functions or the protection of public health. Id.,      . The standards and limitations set forth by the legisla-

ture in § 28-9 (b) (1) were followed by the governor in paragraph 2 (c) of Executive Order No. 7G. As a precondition to the applicability of § 28-9 (b) (1), the governor must first make a proclamation of a civil preparedness emergency or a declaration of a public health emergency, both of which the governor did on March 10, 2020, prior to the conclusion of the 120 day time limit in the present case.

In paragraph 2 (c) of Executive Order No. 7G, the governor suspended the 120 day time limitation for rendering judgments in civil actions provided in § 51-183b. Executive Order No. 7G referenced the COVID-19 "outbreak in the United States and confirmed spread in Connecticut," stated that the virus "spreads easily from person to person and may result in serious illness or death" and noted the "critical shortage of hand sanitizer and personal protective equipment." A requirement of adherence to a strict time limitation on the rendering of judgments in civil cases at the outset of the COVID-19 pandemic, when there were critical shortages in sanitizer and personal protective equipment, reasonably could have interfered with the health and safety of the judges of the Superior Court and courthouse staff, who reasonably could have had to enter courthouses in order to review materials and to perform tasks necessary for the rendering of civil judgments.

The mother argues, citing *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 577 A.2d 1047 (1990), that the time limitation in § 51-183b is jurisdictional. She contends that article fifth, § 1, of the Connecticut constitution provides the General Assembly alone with the authority to define the jurisdiction of the Superior Court.[2] She argues that § 28-9 cannot be applied so as to permit the governor to alter the jurisdiction of the Superior Court because it is the General Assembly, and not the executive branch, that "establishes the jurisdiction of the Superior Court." *Piquet* v. *Chester*, 306 Conn. 173, 188 n.14, 49 A.3d 977 (2012).

This argument is misplaced because § 51-183b does not relate to the jurisdiction of the Superior Court and *Waterman* does not stand for the proposition that § 51-183b is jurisdictional in nature. Section 51-183b does not pertain to the jurisdiction of the court to decide certain types of cases but, rather, it relates to the authority given to the Superior Court to render judgments in civil cases within a certain time frame. There is a "distinction between a trial court's jurisdiction and its authority to act under a particular statute. Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it. . . . Although related, the court's authority to act pursuant to a statute is different from its subject matter jurisdiction. The power of the court to hear and determine, which is implicit in jurisdiction, is not to be confused with the way in which that power must be

exercised in order to comply with the terms of the statute." (Internal quotation marks omitted.) *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 463, 239 A.3d 272 (2020).

For the foregoing reasons, we conclude that the court properly denied the respondents' joint motion for a mistrial. Although the court rendered its judgments outside the 120 day time limit in § 51-183b, that time limitation properly had been suspended at the time when the judgments in the present case were rendered.

## II

### ADJUDICATORY PHASE

The respondents each challenge independently the court's conclusions regarding the adjudicatory phase of the termination proceeding made pursuant to General Statutes § 17a-112 (j) (1) that the department made reasonable efforts to reunify them with the children and that the respondents were unwilling or unable to benefit from such efforts. Before we address these claims, we note the following facts as found by the court regarding Natasha's and Jacob's visitation with the respondents during their periods of incarceration. Natasha had difficulty visiting the mother in prison and experienced high anxiety and difficulty returning to her routine following such visits. Natasha, who had witnessed the respondents' arrests, would indicate that the mother did not protect her or keep her safe and expressed that she did not want to visit the mother in prison. Jacob had episodes of crying and complained of stomach aches following visitation.[3] While playing, Natasha and Jacob would recreate the scene of the police arresting the respondents. As a result of their anxiety, dysregulation and concerning behavior, the children began therapy with DaJavon Davis, a licensed marriage and family therapist, in May, 2018. After working with the children, Davis informed the department that they should not visit the respondents until Natasha and Jacob were better able to regulate their emotions through therapy.

In June, 2018, the petitioner filed a motion for order, seeking to have visitation suspended between the children and the respondents, both of whom were incarcerated at that time. In the motion, the petitioner stated that Davis recommended that visitation be suspended at that time "due to the negative impact these visits are having on the children." On August 22, 2018, following an evidentiary hearing, the court, *Sanchez-Figuerora, J.*, granted the motion and determined that it was in the children's best interests to suspend the visits.

The department conferred regularly with Davis to assess the children's fitness to resume contact with the respondents. A phone call between the respondents and the children took place on July 19, 2019, during which time Natasha became upset and left the room. After further work with Davis, Natasha sent photographs of

herself to the mother in August, 2019. The mother filed a motion for a psychological evaluation of the family in February, 2019. The court, *Sanchez-Figueroa, J.*, granted the motion. Mary Cheyne, a psychologist who conducted the psychological evaluation of the family, stated in her evaluation that it would benefit the children to form a positive relationship with the respondents. Nevertheless, she concluded that it was best for the children to achieve permanency through an open adoption.

The following principles guide our analysis. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under . . . § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase." (Internal quotation marks omitted.) *In re Shaiesha O.*, 93 Conn. App. 42, 47, 887 A.2d 415 (2006).

"[T]he statutory requirement of § 17a-112 (j) (1) may be satisfied in any one of three ways: (1) by showing that the department made reasonable efforts to reunify; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) by a previous judicial determination that such efforts were not appropriate. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citation omitted; internal quotation marks omitted.) *In re Jonathan C.*, 86 Conn. App. 169, 179, 860 A.2d 305 (2004).

"Our Supreme Court clarified the applicable standard of review of an appeal from a judgment of the trial court pursuant to § 17a-112 (j). . . . [T]he court clarified that [w]e review the trial court's subordinate factual findings for clear error. . . . We review the trial court's ultimate determination that a parent has failed to achieve sufficient rehabilitation [or that a parent is unable to benefit from reunification services] for evidentiary sufficiency. . . . [I]t is appropriate to apply the same standard of review of a trial court's decision with respect to whether the department made reasonable efforts at reunification." (Citations omitted; internal quotation marks omitted.) *In re Corey C.*, 198 Conn. App. 41, 59, 232 A.3d 1237, cert. denied, 335 Conn. 930, 236 A.3d 217 (2020).

A

In AC 44237, the mother claims that the court improp-

erly concluded that the department made reasonable efforts to reunify her with Natasha and Jacob. We disagree.

The following additional facts, as found by the court, are relevant. The court found that the department referred the mother "to many services over a number of years to assist her in an effort to reunify her with Natasha and Jacob. [The department] has offered her substance abuse treatment, mental health treatment, parent mentoring services, visitation services, domestic violence counseling, and transportation." The court noted that, in 2016, the mother had admitted to using heroin daily and to having overdosed on heroin on November 22, 2016. She accepted services at the Recovery Specialist Voluntary Program, where it was recommended that she attend a partial hospitalization program at the Rushford Center on December 5, 2016. In November, 2016, the department referred the mother to the Amethyst House, a residential substance abuse program, which she entered in January, 2017. The children were reunited with the mother at the Amethyst House on March 30, 2017, and returned to their apartment. She was discharged to the Rushford Center to attend a partial hospitalization program and an intensive outpatient program, both of which she completed successfully, and she was discharged from the Rushford Center in September, 2017. The court further found that "[s]ubsequent to [the] mother's incarceration on December 1, 2017, the department continued to make reasonable reunification efforts by maintaining monthly phone contact with [the mother] to address the status of the case."

The mother's argument on appeal focuses on the time frame following the court's August 22, 2018 order suspending visitation, and she contends that the department did not make any effort to reunify her with her children during that time frame. She argues that, "[i]n view of the dearth of evidence surrounding the petitioner's efforts to investigate whether family therapy of the kind recommended by . . . Cheyne would have ameliorated the children's fears about visiting the respondent within a prison setting, it was not clear from the record that there was nothing more the department could have done [to reunite the family]." (Internal quotation marks omitted.)

The mother mischaracterizes the recommendations of Cheyne, who did not recommend that the children and the respondents engage in some type of family therapy while the mother was incarcerated.[4] Rather, Cheyne discussed an eventual progression toward in person contact "in a perceived safe place," but stressed that she did not recommend reunification in her evaluation "because, even while [the respondents] seem to have made some strides in terms of their personal growth and in their substance abuse, I also know that

them being incarcerated is a very contained environment and I wouldn't be comfortable talking about any kind of reunification until I saw a good twelve to eighteen plus months of appropriate behavior outside of incarceration and that's too long for these children to wait for permanency." The goal of Cheyne's recommendations was not to reduce the children's negative reactions to visiting their mother in prison.[5] Rather, Cheyne testified at trial that her recommendations focused on how positive memories of their biological parents would assist in the children's emotional well-being. She testified that she recommended "what would take the form of a reunification therapy but not necessarily reunification" and suggested therapeutically arranged contacts, through Davis, to assist with forming positive memories. She specified that Davis would determine the extent to which the children were able to reach out and specified that the respondents' responses would be reviewed by Davis before the children received them.

There was evidence that the process described by Cheyne was underway. During the mother's incarceration, there initially were visits between the mother and the children, but Davis noted the adverse reactions of the children to such visits and recommended that the visits be suspended until the children were better able to regulate their emotions through therapy. A phone call between the respondents and the children took place in July, 2019, but Natasha became upset and left the room. Eventually in August, 2019, at Natasha's request, and with the assistance of a social worker, photographs of herself were sent to the mother. After visitation was suspended, a social worker requested monthly updates from Davis regarding the children's therapy, specifically as to whether the children were ready to resume visitation. In addition, a social worker called the mother monthly to provide updates on the children and to receive updates from the mother on her participation in programs while incarcerated.

These facts are much different than those in *In re Oreoluwa O.*, 321 Conn. 523, 139 A.3d 674 (2016) (*Oreoluwa*), on which the mother principally relies. In *Oreoluwa*, our Supreme Court reversed the judgment of the trial court terminating the parental rights of the father, who lived in Nigeria and who had difficulty traveling to the United States to visit his biological son who had a medically complex heart condition. Id., 526–43. The court determined that the trial court based its review of the efforts made by the department to reunify on a presumption that the father needed to be present in this country in order to engage in reunification efforts because Oreoluwa could not travel to Nigeria due to medical issues. Id., 542–43. The court noted that no evidence was presented "regarding any additional steps taken to obtain more specific information about when Oreoluwa may be cleared to travel or at least when the medical authorities would have some clarity regarding

his future ability to travel. Because the respondent [father] was having difficulty traveling to this country to be with Oreoluwa, the department's utter failure to determine when Oreoluwa would be able to travel to Nigeria can hardly be taken as evidence of an effort to reunify the two." Id., 543. The court further reasoned that no evidence was presented regarding the department's efforts to investigate the type of medical care that Oreoluwa would receive in Nigeria. Id., 542–43. The court stated that "[w]ithout updated medical information regarding Oreoluwa's ability to travel and medical needs, however, we conclude that the commissioner did not meet the burden of demonstrating that the department did everything reasonable under the circumstances to reunite the respondent with Oreoluwa." (Internal quotation marks omitted.) Id., 546.

The mother argues that her situation is similar to that of the respondent father in *Oreoluwa*, who was "confined" to the country of Nigeria and whose child had a complex medical condition because she "could not visit with the children due to their medical complexity without the assistance of the petitioner, as an agent of the state, to investigate services that would be logically calculated to overcome the physical and medical barriers preventing the visits with the children."

The present case and *Oreoluwa* are inapposite. In *Oreoluwa*, the department failed to make any effort to determine whether the child was medically able to travel to Nigeria. Unlike the minor child in *Oreoluwa*, who never visited his father in Nigeria, the children in the present case actually visited the mother in prison until visits were suspended. Further, the department made reasonable efforts by regularly communicating with Davis to inquire about the children's ability to resume visitation. Additionally, in the present case, unlike in *Oreoluwa*, the reunification efforts made by the department following the court's suspension of visitation comprised only one segment in a series of reunification services provided to the mother. In *Oreoluwa*, the entirety of the reunification efforts took place under circumstances wherein the department never investigated whether the child could travel to Nigeria to visit the biological father. *In re Oreoluwa O.*, supra, 321 Conn. 545.

Although the mother's argument focuses on only one time frame, we note that throughout the entire process the department made reasonable efforts to reunify the mother with the children. The department offered the mother mental health treatment, parent mentoring services, visitation services, domestic violence counseling and transportation. The mother, who had admitted to having overdosed on heroin and to using heroin daily, was provided with substance abuse treatment by the department. The children were placed at the Amethyst House with the mother and she was provided with fur-

ther substance abuse treatment, including a partial hospitalization program and an intensive outpatient program at the Rushford Center. We conclude, on the basis of this record, that the court's conclusion that the department made reasonable efforts to reunify the mother with the children was supported sufficiently by the evidence.

B

In AC 44233, the father claims that the court improperly concluded that the department made reasonable efforts to reunify him with Jacob. We disagree.

The following additional facts, as found by the trial court, are relevant. The court found that the department made "extensive efforts to find and engage [the father] in services for the purposes of reunification. [The father] was referred to Fostering Family Services in December, 2016, for supervised visiting and parenting education. He attended only a few sessions and did not successfully complete the program. On December 7, 2016, [the father] submitted to a substance abuse evaluation and urine screen at Rushford Center. [The father] reported that he had a history of opioid dependence covering several years. Nevertheless, [the father] was recommended for detox but declined and reported that he had already undergone primary withdrawal. He also declined the partial hospitalization program . . . due to work concerns on December 9, 2016. In March of 2017, [the father] stopped working with Rushford Center and [Recovery Specialist Voluntary Program] case management services. He did not successfully complete these programs. In January, 2017, [the father] was referred to 24/7 Dads Program. He never followed through with the program. [The father] never engaged in any mental health treatment and denied he had any mental health issues. . . . The department continued to make reasonable efforts to reunify [the father] with Jacob . . . while incarcerated by maintaining monthly communication with him to inform him of Jacob's status and to receive updates on his participate in services while incarcerated."

The father does not contest any of these factual findings. Instead, he argues that the department offered only "minimal services" to him. He contends that the court identified his "presenting problems" as unaddressed mental health concerns, but that "there was no evidence that the department ever referred [him] to mental health services." We are not persuaded.

The court found that the father reported, at a December, 2016 substance abuse evaluation and urine screen at the Rushford Center, that he had a history of opioid dependence covering several years. The department provided the father with referrals for multiple services relating to his substance abuse. The father, however, denied any mental health concerns. In a social study

for the termination of parental rights, dated March 18, 2019, which was admitted as a full exhibit at trial, it was reported that "[the father] has not been engaged in any mental health treatment since the inception of this case. [The father] has denied any mental health issues." Under the circumstances of the present case, wherein the department referred the father for substance abuse services to address his admitted opioid dependence, but where the father did not complete those programs successfully, the court properly determined that it was not unreasonable for the department not to have referred him for mental health services when he had denied having any mental health concerns.

The father further argues that the department did not make reasonable efforts regarding visitation.[6] He contends that the "department's efforts to reunify are dictated by the particular deficiencies in the parent-child relationship. . . . The deficiencies in this particular parent-child relationship was that they were not visiting at all." He further contends that the department did not provide guidance, through changing the specific steps following the order suspending visitation, as to what he could have done to resume visitation. We are not persuaded.

The department referred the father for services relating to any "deficiencies in the parent-child relationship" caused by his opioid dependence. With respect to visitation, it was suspended due to the negative reaction of the children. Contrary to the father's contention that the social worker ceased contacting him in the six months following the order suspending visitation, the court found that the department communicated with the father monthly to provide updates on Jacob's status and to receive updates from him regarding his participation in services while incarcerated, and that the department conferred regularly with Davis to assess the children's fitness to resume contact with the respondents. These findings are not clearly erroneous. There was evidence that a social worker contacted the father monthly and sought monthly updates from Davis regarding the children's progress in therapy and regarding whether the children were ready to resume visitation. As we have noted previously, "[r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Jonathan C.*, supra, 86 Conn. App. 179. The department's efforts regarding visitation were reasonable under the circumstances wherein Jacob had negative reactions following visitation, the court suspended visitation, the department checked in with the father regularly and the department continually contacted Davis to assess whether resumption of visitation was advisable. On the basis of this record, we conclude that the court's conclusion that the department made reasonable efforts to reunify the father with Jacob was supported by sufficient evidence.

## C

In their respective appeals, both respondents claim that the court improperly determined that they were unwilling or unable to benefit from reunification efforts. We need not review these claims because we have determined that the court's conclusion that the department made reasonable reunification efforts regarding both respondents was adequately supported by the evidence.

" 'Because the two clauses [of § 17a-112 (j) (1)] are separated by the word "unless," this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or*, *alternatively*, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element.' " (Emphasis in original.) *In re Paul O.*, 141 Conn. App. 477, 485, 62 A.3d 637, cert. denied, 308 Conn. 933, 64 A.3d 332 (2013). Because we have concluded that the court properly determined that the department made reasonable efforts to reunify the respondents with their respective child or children, we do not reach the respondents' additional claims regarding the court's conclusion that they were unable or unwilling to benefit from reunification. See id.

## III

## DISPOSITIONAL PHASE

In AC 44233, the father additionally claims that the court improperly concluded that the termination of his parental rights was in the best interest of Jacob. We disagree.

We first set forth the following applicable legal standards. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnote omitted; internal quotation marks omitted.) *In re Joseph M.*, 158 Conn. App. 849, 868–69, 120 A.3d

1271 (2015); see *In re Kiara Liz V.*, 203 Conn. App. 613, 626,    A.3d    (2021) (determination that termination of parental rights is in best interest of child overturned only if trial court's findings are clearly erroneous); see also General Statutes § 17a-112 (k).[7]

"[T]he fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing of evidence . . . by the legislature. [If] . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A] trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Citations omitted; internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 739–40, 120 A.3d 1177 (2015).

The court considered and made written findings as to all seven statutory factors. The father challenges the court's findings and conclusions with respect to four of those factors. For our analysis regarding some of these challenged factors, the court's findings regarding visitation, which are detailed in part II of this opinion, are relevant.

The father argues, with respect to the reasonable efforts factor, § 17a-112 (k) (2), that the department has not made reasonable efforts to reunite Jacob with him. He contends that the department did not make any referrals for mental health services or for services to improve his parenting skills. The father overlooks the court's finding that he had denied that he had any mental health concerns. The court determined that the department offered him "appropriate and timely services from the beginning of the case" including "invitations to participate in Administrative Case Reviews, supervised visitations, Rushford Center Recovery Specialist Voluntary Program . . . 24/7 Dads Program, Considered Removal Team Meeting, ABH referrals, permanency team meetings, DCF Regional Resource Group and the Fostering Family Services Program." The court found that the "timeliness, nature, and extent of the services offered by [the department] to be fair and reasonable." These findings are not clearly erroneous.

The court determined that the father neither adjusted nor corrected his circumstances to make it in Jacob's best interest to be returned to him. See General Statutes

§ 17a-112 (k) (6). The father contends that he participated in various programs, including a drug and alcohol program as well as a fatherhood program while incarcerated in order to adjust his circumstances. Despite any progress the father made during incarceration, the court noted that Cheyne indicated that he would require another twelve to eighteen months of documented sobriety postincarceration, compliance with probation, gainful employment and stable housing before she would consider recommending reunification. "[W]e will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court." (Internal quotation marks omitted.) *In re Anaishaly C.*, 190 Conn. App. 667, 692, 213 A.3d 12 (2019).

Regarding the feelings and emotional ties factor, § 17a-112 (k) (4), the court noted the physical and emotional discomfort experienced by Jacob, who was four years old at the time of the court's decision, and his older sister, Natasha, as a result of having visited the respondents in prison. The court noted that "[t]he children have been in their current legal risk preadoptive placement since April, 2018. They have bonded with their foster parents who provide them with safety and security. They have developed emotional ties with their foster parents who they call 'mom and dad.' "[8] The father argues that even though the children had not seen him for one year, they still had negative feelings toward him, which indicates that something else was at play. We will address the father's argument regarding alleged interference in his relationship with Jacob when reviewing his argument regarding the statutory factor in § 17a-112 (k) (7). For purposes of his emotional ties argument, we note that it is clear from the court's findings and the record that the court's order regarding the suspension of visitation was due to the children's negative reactions following visitation with the respondents. We further note that when addressing the emotional ties factor, it was proper for the court to consider the bond that Jacob had with the preadoptive parents. "In considering the minor child's emotional ties under § 17a-112 (k) (4), it is appropriate for the trial court to consider the [child's] emotional ties to the preadoptive foster family in considering whether termination of the respondent's parental rights [is] in the children's best interest[s].§ (Internal quotation marks omitted.) *In re Elijah G.-R.*, 167 Conn. App. 1, 30–31, 142 A.3d 482 (2016).

Regarding § 17a-112 (k) (7), the father argues that he was prevented from maintaining a meaningful relationship with Jacob due to the unreasonable conduct of the foster mother and Davis. With respect to Davis, the father highlights events leading up to Davis' recommendation to suspend visits including testimony during the evidentiary hearing on the motion to suspend visitation, such as Davis' statement on cross-examination that he had two sessions with Jacob prior to recommending

that visitation be suspended. We do not agree with the father's argument that the circumstances under which Davis made his recommendation to suspend visitation somehow indicate that Davis engaged in unreasonable conduct that prevented the father from maintaining a meaningful relationship with Jacob. The court found that visitation between the children and the respondents "caused so much physical and emotional distress to the children that their therapist [Davis] petitioned the court to suspend such contact. The court granted a suspension of visitation between the children and parents as a result of the children's physical and emotional distress before and after visits." The court found that the father was not prevented from having a meaningful relationship with Jacob due to the unreasonable acts or conduct of another person but rather that it was his own actions that caused him not to have a meaningful relationship with Jacob. This finding is supported by the record and, therefore, is not clearly erroneous.

Regarding the father's argument as to the foster mother, we note that the issue of whether her actions contributed to the children's negative feelings toward the respondents was a contested issue at trial. The father highlights the testimony of the guardian ad litem in support of his argument. There was ample testimony from the foster mother, Davis and Cheyne that the foster mother acted appropriately. The court found that the foster mother facilitated visitation between Jacob and the father. We cannot second-guess credibility determinations of the trial court on appeal. See *In re Jason M.*, 140 Conn. App. 708, 736, 59 A.3d 902, cert. denied, 308 Conn. 931, 64 A.3d 330, cert. denied sub nom. *Charline P.* v. *Connecticut Dept. of Children & Families*, 571 U.S. 1079, 134 S. Ct. 701, 187 L. Ed. 2d 564 (2013).

The father further argues that termination of his parental rights is not in Jacob's best interest because Jacob deserved the opportunity to form positive memories of him. The father contends that Cheyne recommended that the children establish positive memories of their biological parents. Termination of the father's parental rights to Jacob does not necessarily nullify Cheyne's recommendation. Cheyne's focus was on the well-being of the children when she described a process by which the children could form positive memories of their biological parents for their own well-being. Cheyne testified that she was not recommending that the department or the court pursue reunification, and stated in her evaluation that an open adoption would be best.

Additionally, the court's determination that termination of the father's parental rights was in Jacob's best interest is also supported by the remaining statutory factors, as well as the court's conclusion regarding the need for permanency and stability. See, e.g., *In re Elijah*

*G.-R.*, supra, 167 Conn. App. 34. The father has failed to demonstrate that the court's determination that the termination of his parental rights was in the best interest of Jacob was clearly erroneous.

## IV

### POSTTERMINATION CONTACT

In AC 44233, the father additionally claims that the court improperly concluded that it lacked authority to grant posttermination contact. The father directs our attention to a discussion during trial in which the court stated: "I don't believe, and of course counsel can inform the court in their posttrial briefs, that there's any authority that the court can require [posttermination] communication to continue." The court did not make a ruling regarding posttermination contact but, rather, invited counsel to include such authority in the posttrial briefs, if so inclined. Moreover, the father did not request during trial or in his joint posttrial brief that the court order posttermination contact, and, therefore, the claim is unreviewable. "Our appellate courts, as a general practice, will not review claims made for the first time on appeal. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. . . . The purpose of our preservation requirements is to ensure fair notice of a party's claims to both the trial court and opposing parties." (Internal quotation marks omitted.) *Guddo* v. *Guddo*, 185 Conn. App. 283, 286–87, 196 A.3d 1246 (2018).

## V

### MOTION TO INTERVENE

In AC 44237, the mother additionally challenges the court's denial of her posttermination motion to intervene in which she sought posttermination visitation with the children. In the unusual procedural posture of this case, the mother, who was a party to the termination proceedings, filed a motion to intervene in September, 2020, *after* the trial court had rendered its July, 2020 judgments terminating her parental rights to the children. In her motion, the mother argued that the court should grant her motion to intervene pursuant to General Statutes § 46b-121 and *In re Ava W.*, 336 Conn. 545, A.3d (2020). The court summarily denied the motion.

The mother argues that the court improperly denied her motion to intervene in which she sought posttermination visitation with the children.[9] Because the record is inadequate, we decline to review this claim. "[P]ursuant to Practice Book § 64-1 (a), the court [is] required to state, either orally or in writing, a decision that encompassed its conclusion as to each claim of law raised by the parties and the factual basis therefor. . . . If an oral decision is rendered, a signed transcript of the oral decision should be created and filed for use in

any appeal. If the court fails to file an oral or written decision, the appellant, who has the duty to provide an adequate record for appellate review; see Practice Book § 61-10; must file a notice to that effect with the appellate clerk in accordance with Practice Book § 64-1 (b)." (Internal quotation marks omitted.) *Gordon* v. *Gordon*, 148 Conn. App. 59, 66–67, 84 A.3d 923 (2014).

The court did not file a written memorandum of decision explaining its ruling. The mother did not file a notice pursuant to Practice Book § 64-1 (b) with the Office of the Appellate Clerk, nor did she file a motion asking the court to articulate the factual and legal basis for its ruling. See Practice Book § 66-5. On the record before us, we are left to speculate as to the court's reasons for denying the motion to intervene. The court could have, inter alia, concluded that a biological parent has no right to seek visitation after judgments terminating parental rights to her children have been rendered or it could have determined on the merits that posttermination visitation was not appropriate under the circumstances.[10] Because we do not know the trial court's factual or legal bases for denying the motion, the record is inadequate for us to review this claim.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in these appeals are not disclosed. The records and papers of these cases shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** May 20, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In its memorandum of decision, the court also terminated the parental rights of Natasha's biological father, Charles L., who did not participate in this appeal.

[2] Article fifth, § 1, of the Connecticut constitution, as amended by article twenty, § 1, of the amendments, provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

[3] The court found that, in November, 2018, Jacob had surgery to remove his appendix and a section of diseased bowel. The court noted that his therapist, DaJavon Davis, worked with Jacob to address his negative reactions to visitation.

[4] In her evaluation, Cheyne stated that "[r]eunification would need to be conducted within a therapeutic framework of, or similar to, parent-child reunification therapy. Only if that is successful will [the] children feel comfortable visiting with their parents. And, this cannot begin until [the] parents are no longer incarcerated." In her evaluation, however, Cheyne recommended open adoption.

[5] If the mother wanted investigation into this type of therapy, she could have requested that the department make such an effort. See *In re Corey C.*, supra, 198 Conn. App. 64 (respondent's failure to request certain services undermines argument that services were part of what department should have provided as part of reasonable efforts to reunify).

[6] He also contends that, prior to the suspension of visitation in August, 2018, he did not have visitation with Jacob in March, 2018, April, 2018, June, 2018, or July, 2018, in violation of General Statutes § 17a-10a (a). We note that the father's argument ignores that there is no statutory guarantee of visitation on any certain or definite timetable, but rather it is "based upon consideration of the best interests of the child." General Statutes § 17a-10a (b). The father did not raise this issue in his posttrial brief or at trial and,

understandably, the court did not address this issue. Accordingly, we do not review it. *Guddo* v. *Guddo*, 185 Conn. App. 283, 286–87, 196 A.3d 1246 (2018) (because our review is limited to matters in record we do not address issues not decided by trial court).

[7] General Statutes § 17a-112 (k) provides in relevant part that, "in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[8] The court discussed the respondents and the children together in some contexts. Our resolution of this claim focuses on the father and Jacob.

[9] The mother further argues that, as a biological parent, she has standing to seek a determination of her visitation rights pursuant to a writ of habeas corpus. Whether the mother would have standing to bring a writ of habeas corpus to seek visitation is not properly before us in this appeal because it was not raised in the trial court. The mother did not seek a writ of habeas corpus nor did she raise an issue in her motion to intervene that might cause a court to consider construing that motion as such. Because the issue has not been raised in the trial court, we do not address it on appeal. See *Guddo* v. *Guddo*, supra, 185 Conn. App. 286–87.

[10] The mother argues that an analysis of the prudential considerations mentioned in *In re Ava W.*, supra, 336 Conn. 545, indicates that she had a right to be heard on her motion to intervene. Our Supreme Court stated in *In re Ava W.*, that "a trial court has authority to issue a posttermination visitation order that is requested within the context of a termination proceeding, so long as it is necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child. That authority derives from the court's broad common-law authority over juvenile matters and the legislature's enactment of § 46b-121 (b) (1) codifying that authority." Id., 548–49. The court explained that "[w]e do not opine upon whether a trial court has authority to consider a request for posttermination visitation made after parental rights have been terminated." (Emphasis omitted.) Id., 590 n.18. This statement by our Supreme Court indicates that it did not resolve in *In re Ava W.*, the issue of whether a trial court has the authority to consider a posttermination request for visitation. The mother has not cited any case law, nor are we aware of any, to suggest that she is entitled to a hearing on a postjudgment motion to intervene seeking visitation in a case in which she was a party.

---