******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE NEVAEH T.[*]
## (AC 49495)

Elgo, Clark and Seeley, Js.

*Syllabus*

The respondent father appealed from the trial court's judgment terminating his parental rights with respect to his minor child, N, and denying his motion for posttermination visitation or contact. The father claimed that the court improperly denied his motion for posttermination visitation or contact because the court did not properly weigh the informed preference of N to have continued contact with him through letters or phone calls. *Held*:

The respondent father's claim that the trial court improperly denied his motion for posttermination contact between him and N was unavailing, as this court could not conclude that the trial court erred in finding that a posttermination contact order was not necessary or appropriate to secure N's welfare, protection, proper care and suitable support.

Argued May 28—officially released June 17, 2026[**]

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, where the case was tried to the court, *Conway, J.*; judgment terminating the respondents' parental rights and denying the respondent father's motion for posttermination visitation or contact, from which the respondent father appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Alma Rose Nunley*, assistant solicitor general, with whom, on the brief, were *William Tong*, attorney general,

---

[*]In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

[**]June 17, 2026, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

and *Heather J. Wilson*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SEELEY, J. The respondent father, Dennis M.,[1] appeals from the judgment of the trial court terminating his parental rights with respect to, and denying his motion for posttermination visitation or contact with, his minor daughter, Nevaeh T. (Nevaeh).[2] On appeal, the respondent challenges only the court's decision denying his motion for posttermination visitation or contact with Nevaeh. Specifically, he claims that the court, in denying his motion, did not properly weigh the "informed preference" of Nevaeh to have continued contact with the respondent through letters or phone calls. We affirm the judgment of the trial court.

The following facts, as found by the court by clear and convincing evidence, and procedural history are relevant to our resolution of this appeal. In early March 2023, Nevaeh, along with her mother, Felicia T., and two brothers, Xavier T. (Xavier) and Robert T. (Robert), "were living with Dawne M. and Daniel C., unrelated acquaintances of [Felicia T.].[3] Nevaeh referred to Dawne M. as 'aunt' and Daniel C. as 'uncle.' " (Footnote added.) "On or about March 2, 2023, Nevaeh's school staff reported concerns regarding Nevaeh's presentation; she was sad and withdrawn with ongoing hygiene issues. Additionally, Nevaeh had sent an email from her school Chromebook alleging [that] she was being abused by Dawne M. . . . [An employee of the Department of Children and Families (department)] met with Nevaeh at the school, and, in addition to what the school had

---

[1]The court also terminated the parental rights of the respondent mother, Felicia T. Because Felicia T. is not involved in this appeal, our references in this opinion to the respondent are to the respondent father.

[2]The attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal, the Commissioner of Children and Families, pursuant to Practice Book §§ 67-13 and 79a-6 (c).

[3]At that time, Nevaeh was ten years old, Xavier was thirteen years old, and Robert was four years old.

observed, the worker noted various bruises on Nevaeh's body. . . . Subsequently, upon visiting the family home, the department found the home to be in deplorable condition, filthy, with animal feces spread over floors, marijuana paraphernalia accessible to the children, trash on the floor and the presence of significant clutter. Like Nevaeh, the boys presented disheveled and unkempt. The children were sent to stay with a family friend to afford [Felicia T.] an opportunity to clean up the home. The children returned home a few days later. . . .

"On March 9 [2023], Nevaeh, again using her school Chromebook, emailed a friend and disclosed [that] she was being touched in her vagina by Dawne M. Nevaeh had sent a similar email on March 7 [2023] but [Felicia T.] deleted the email. [Felicia T.] initially denied deleting the email but eventually admitted [that] she [had] deleted the email to prevent the children from being removed from her care and because she . . . did not believe Nevaeh's disclosure that Dawne M. had inappropriately touched her."[4] (Footnote omitted.)

On March 9, 2023, the department "invoked a ninety-six hour hold and assumed temporary custody of the three children. On or about March 13, 2023, the [petitioner, the Commissioner of Children and Families] sought and obtained an order of temporary custody . . . of the three children, and, on or about June 15, 2023, the children were adjudicated neglected and committed to the . . . custody [of the petitioner]. The children have remained in the department's care continuously since March 9, 2023." Initially, the three children were placed together in a foster home of a relative, but Nevaeh struggled with that placement. In May 2023, she transitioned to her third and current foster home, which is a nonrelative, therapeutic foster home.

After Nevaeh was removed from Felicia T.'s care, she "disclosed [that] she [slept] in the same bed with Dawne M. and Daniel C. Nevaeh eventually disclosed that both

[4]Nevaeh was sexually assaulted by a neighbor when Nevaeh was eight years old and living elsewhere with her mother.

Dawne M. and Daniel C. physically assaulted her as a form [of] discipline and [that] they attempted to get Xavier to hit Nevaeh. [Felicia T.] often left the children in the care of Dawne M., even after Nevaeh had disclosed abuse.[5]" (Footnote in original; footnote omitted.)

The respondent had ceased all contact with Nevaeh when she was approximately five years old. He did so because he and Felicia T. "did not get along and disagreed on child-rearing practices." The respondent currently is incarcerated in connection with a 2021 conviction "of sexually assaulting and having sexual contact with a minor in 2017.[6] His 2017 victim was his live-in (now) [former girlfriend's] minor daughter. On or about February 1, 2023, he was sentenced to the custody of the Commissioner of Correction . . . for eighteen years, execution . . . suspended after he serves . . . eight years and five months . . . followed by ten years of probation. Additionally, he is listed on the state's sex offender registry for ten years. . . . [His] maximum prison release date is March 2029, but he reports [that] he expects to have a parole hearing in late 2025 or shortly thereafter.[7]" (Footnote added; footnote in original; footnote omitted.)

"Once the [petitioner] assumed custody of the children, [the respondent] contacted the department seeking to reconnect with Nevaeh." Nevaeh, however, was unaware that her father was alive. Therefore, "the department sought guidance and direction from Nevaeh's therapist as to when and how to inform Nevaeh [that] her father

[5]"One or more of the children underwent a forensic evaluation regarding the abuse and neglect allegations. The authorities sought and obtained arrest warrants for Dawne M. and Daniel C. At the time of trial . . . the status of [their] criminal cases [was unclear]."

[6]The respondent "was first incarcerated on the 2017 sexual assault charges in November 2020, and he has remained continuously incarcerated to date."

[7]"[Pursuant to] exhibit F . . . [the respondent] is eligible for a parole hearing in December 2024. Whether a parole hearing was held in 2024 and parole was denied, or [whether] December 2024 is a typographical error and a parole hearing is to take place in December 2025 is unclear. Even if a parole hearing is held in late 2025 or in 2026, there is no [way] to discern the likelihood of [the respondent's] release prior to 2029."

was alive and wanted contact with her. It took time for Nevaeh to process said information but, in approximately December 2023, in person monthly supervised father-child prison visits commenced." "Thirteen year old Nevaeh and [the respondent] enjoy their monthly prison visits, although initially Nevaeh expressed a level of discomfort with being inside a prison. And, on at least one occasion, Nevaeh declined phone calls or FaceTime contact with [the respondent] because she did not like his negative comments about [Felicia T.]."[8]

On September 11, 2024, the petitioner filed a petition for the termination of the parental rights of the respondent and Felicia T. with respect to Nevaeh.[9] A trial on the termination petition took place over the course of three days: July 17 and 22 and August 27, 2025. Just prior to the commencement of trial, on July 11, 2025, the respondent filed a motion for a posttermination visitation or contact order,[10] and Felicia T. filed a similar motion seeking posttermination visitation with Nevaeh on July 15, 2025. The parties agreed to have their motions seeking posttermination visitation consolidated with the trial

---

[8]On two other occasions in 2025, "Nevaeh did not make herself available for transport to a scheduled prison visit. In July 2025, when the department social worker went to pick up Nevaeh and take her to the prison visit, Nevaeh was not home. Nevaeh had walked from the foster home to summer camp, and she later admitted [that] she wanted to go to camp and not to the prison. In August 2025, Nevaeh opted to go to a church social event rather than to the prison visit."

[9]The petitioner also had filed petitions for the termination of Felicia T.'s parental rights with respect to Xavier and Robert, neither of whom is a child of the respondent. Those petitions were tried together with the termination petition regarding Nevaeh.

[10]In his motion, the respondent alleged that, pursuant to *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020), "this court has the authority to enter an appropriate order concerning parent-child visitation, even after the granting of a [termination of parental rights] petition"; that he "is appropriate and nurturing in visits and interaction with [Nevaeh]"; that "[a] clear bond has been established and exists between [the respondent] and [Nevaeh]"; and that Nevaeh's "[c]ontinuing visitation and contact with [the respondent] would be necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Nevaeh]. Further, visitation and contact would be appropriate and in the best interests of [Nevaeh]."

on the termination petition. "Neither parent testified or presented witnesses or evidence in support of their motions, other than through cross-examination of the petitioner's witnesses and exhibits in the termination case.[11] Additionally, neither [parent] proffered specifics as to the frequency, duration, location, or mode of posttermination visitation/contact being requested." (Footnote added.)

On October 31, 2025, following the trial, the court issued a memorandum of decision in which it terminated the respondent's parental rights[12] with respect to Nevaeh,[13] which the respondent does not challenge on appeal, and denied the respondent's motion for posttermination visitation or contact with Nevaeh. The following additional findings by the court are relevant to its decision denying the respondent's motion. "In 2024, Nevaeh [had] informed [the respondent] that she wanted to be adopted by her foster mother. [The respondent] reacted appropriately to Nevaeh's announcement and assured Nevaeh [that] he supported her decision. [The respondent] recognizes [that] he is not a placement

[11]At the termination trial, the petitioner presented testimony from Jessica Biren-Caverly, a licensed psychologist who had performed a psychological evaluation of Felicia T. and the three children in March 2025, and various social workers with the department, namely, Elizabeth Herrera, Cheri Walker, Bianca Kennedy, and Lianna Carrero. The court also admitted into evidence Biren-Caverly's psychological evaluation; the specific steps ordered for, and the certified criminal histories of, the respondent and Felicia T.; and various social studies, permanency plan studies and status reports of the department.

[12]See footnote 1 of this opinion.

[13]Specifically, in the adjudicatory phase, the court found, by clear and convincing evidence, that the department had made reasonable efforts in light of the limits imposed by the respondent's incarceration to reunify the respondent with Nevaeh and that, although the respondent is willing, he is unable to benefit from reunification efforts. Next, the court found, by clear and convincing evidence, that the respondent had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, he could assume a responsible position in Nevaeh's life. Thereafter, in the dispositional phase, the court considered the seven statutory factors in General Statutes § 17a-112 (k) and determined that it was in Nevaeh's best interest to terminate the respondent's parental rights.

resource for Nevaeh but seeks ongoing contact with Nevaeh if his parental rights were to be terminated.”

“Nevaeh’s nonrelative, therapeutic foster family is made up of Nevaeh and [her] foster mother. Nevaeh has lived with her foster mother for almost two and [one-half] years. Nevaeh desires to be adopted by her foster mother. . . . [T]hirteen year old Nevaeh desires to have in person contact with [Felicia T.] posttermination. Nevaeh is only open to limited contact with [the respondent] through letters and phone calls.[14] Nevaeh’s foster mother adamantly objects to any form of posttermination visitation [or] contact . . . involving either [the] respondent [or Felicia T.]. She reports to the department that a court imposed posttermination visitation/contact order may cause her to reconsider adoption. Nevaeh is cognizant [that her] foster mother is not keen on her having posttermination in person contact with [the respondent] . . . but Nevaeh is unaware [that] her foster mother may back out of adopting her if a court-ordered visitation/contact order were to [be] issue[d].

“In [the respondent’s] monthly prison visits with Nevaeh and in his primarily one-sided correspondence with Nevaeh, he encourages Nevaeh to do her best in school and to behave appropriately. As discussed . . . [the respondent] elected to sever contact with Nevaeh when she was approximately five years old. He did not reappear in her life until 2023, when she was approximately eleven years old and he was serving a lengthy prison sentence for sexually assaulting his girlfriend’s minor daughter in 2017. The degree of his abandonment of Nevaeh was such that Nevaeh was unaware [that] he was alive. She only learned of his continued existence when, in concert with Nevaeh’s clinician, the department informed

---

[14] Lianna Carrero, a department social worker, testified about her conversations with Nevaeh concerning posttermination contact with the respondent, stating that, at the end of July 2025, Nevaeh had reported to her that “she does not want in person contact with [the respondent] postadoption, but she is open to letters and phone calls.”

Nevaeh [that] her father was not only alive but wanted her to visit him in prison.

"At best, Nevaeh and [the respondent] share a congenial, monthly, supervised visitation session. . . . [F]or the July and August 2025 scheduled prison visits, [however] Nevaeh opted out of going to the visits. And she is clear that, posttermination, she does not want in person contact with [the respondent] and, at most, is open to letters and calls from him.

"Nevaeh only regained [the respondent's] attention after he had spent a couple of years in prison (with several more years still to serve) for sexually assaulting a minor female. The foster mother shared with [a court psychologist that] she is nervous about what will happen after Nevaeh's father is released from incarceration if he knows her address. . . . Regardless of the merit of the foster mother's concerns regarding [the respondent], she is steadfast in her desire for a closed adoption.

"The inherent baseness of [the respondent's] child sexual assault behavior (that ultimately resulted in a protracted prison sentence followed by a decade long period of probation and placement on the state's sexual offender registry), particularly given Nevaeh's past sexual and physical assault victimization, demand that posttermination visitation/contact be scrupulously considered. [The respondent] has failed to provide this court with any testimony or evidence that assuages the court's security concerns. The potential benefit, if any, that Nevaeh may derive from a posttermination visitation contact order as to [the respondent] [does not outweigh] the potential harm such an order could potentially inflict on Nevaeh's emotional and physical well-being, or on her relationship with [her] foster mother, or on her future adoption possibilities. Having considered the . . . factors [set forth in *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020)], this court concludes [that] a posttermination contact order is not necessary or appropriate to secure Nevaeh's welfare, protection, proper care and suitable support. Accordingly, [the respondent's] motion for

posttermination visitation/contact is denied." (Citations omitted; footnote added; footnotes omitted.) This appeal followed.

On appeal, the respondent claims that denying his motion for posttermination visitation or contact with Nevaeh was not in Nevaeh's "best interests[15] and that continued, though limited, contact with the [respondent] is necessary and appropriate to secure [Nevaeh's] welfare, protection, proper care, and suitable support."[16] (Footnote added.) In particular, the respondent contends: "Because [Nevaeh] is of an age where she can articulate an informed position, and because the clinical evidence supports [her] position, the trial court erred in denying posttermination contact. Further, because the parameters of . . . posttermination visitation orders have not been fully mapped by our reviewing courts, even to the extent of whether such visitation should continue after adoption, the weight to be given [a] minor child's preference as to posttermination visitation has not been fully

[15]To the extent that the respondent claims that the best interest of the child standard applies to the court's decision concerning his motion for posttermination visitation or contact, the claim fails. See *In re Annessa J.*, 343 Conn. 642, 670, 284 A.3d 562 (2022) ("trial courts must adhere to the 'necessary or appropriate' standard set forth in [General Statutes] § 46b-121 (b) (1), not the 'best interest of the child' standard, when ruling on motions for posttermination visitation").

[16]In his principal appellate brief, the respondent asserts that he "does not seek in person visitation in opposition to [Nevaeh's] wishes but, instead, seeks to be able to continue to contact her through letters and, possibly, phone calls." The petitioner argues that the respondent did not preserve this claim and, thus, that we should decline to review it because the respondent is claiming, for the first time on appeal, that he is not seeking in person visitation with Nevaeh. We disagree with the petitioner. In his motion for posttermination visitation, the respondent requested the court to "enter an order for appropriate and supervised visitation and/or contact with [Nevaeh]." The respondent, therefore, sought, at a minimum, an order allowing him to have *contact* with Nevaeh, which does not necessarily mean in person visitation, and the court's decision refers to "posttermination visitation/contact . . . ." Moreover, that fact that, on appeal, the respondent challenges only the court's failure to enter an order for posttermination contact with Nevaeh, rather than its failure to allow for posttermination, in person visitation with Nevaeh, does not render his claim unpreserved.

explored. The [respondent] argues that where, as here, [Nevaeh] is capable of stating an informed preference—and that position is not overborn by clinical evidence that continued contact would be harmful—[Nevaeh's] wishes should be afforded substantial weight."

In support of this contention, the respondent points to his continued expressions of interest in Nevaeh's well-being, the court's description of his relationship with Nevaeh as " 'congenial,' " testimony from Lianna Carrero, a department social worker, that Nevaeh is "open to letters and phone calls" from the respondent, and testimony from Jessica Biren-Caverly, a licensed psychologist who had performed a psychological evaluation of Nevaeh, that it would be appropriate for the court to fashion an order allowing for continuing contact between Nevaeh and the respondent. According to the respondent, Nevaeh's "wishes should be given greater weight" in this case because she "is of an age where she is able to understand the ramifications of posttermination visitation, especially where the weight of the clinical evidence supports a continuation of contact between [Nevaeh] and the respondent," and "both [Nevaeh] and the court-ordered psychologist recognize the benefit of continued contact between the [respondent] and [Nevaeh]." Thus, the respondent asserts that, because "the trial court did not give due weight to the informed preference of [Nevaeh]," its decision denying his motion for posttermination visitation should be reversed. We do not agree.

We first set forth our standard of review and relevant legal principles. "In *In re Ava W.*, [our Supreme Court] held, for the first time, that a trial court has the authority to consider a motion for posttermination visitation when the court considers termination of parental rights pursuant to [General Statutes] § 17a-112 (j). *In re Ava W.*, [supra, 336 Conn. 548–49]. This authority . . . originates from the trial court's broad authority in juvenile matters, codified at [General Statutes] § 46b-121 (b) (1), 'to make and enforce such orders . . . necessary or appropriate to secure the welfare, protection, proper care and suitable

support of a child,' including orders impacting parental rights, such as termination and visitation. See *In re Ava W.*, supra, 572–76." (Footnote omitted.) *In re Annessa J.*, 343 Conn. 642, 667–68, 284 A.3d 562 (2022).

As our Supreme Court stated in *In re Ava W.*, supra, 336 Conn. 545, "the mo[st] prudent approach when evaluating whether posttermination visitation should be ordered is to adhere to the standard that the legislature expressly adopted [in § 46b-121 (b) (1)]—'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . .' General Statutes § 46b-121 (b) (1) . . . ." Id., 589. In *In re Annessa J.*, the court further explained: "The term 'necessary,' when used in this context, has one fixed meaning: 'Impossible to be otherwise . . . indispensable; requisite; [or] essential.' Webster's New International Dictionary (1931) p. 1443. Although the definition of 'appropriate' is elastic insofar as it is susceptible to a number of meanings; see, e.*g.*, id., p. 111 (defining 'appropriate' as '[b]elonging peculiarly,' 'suitable,' 'fit,' or 'proper'); given the fact that the preceding word in the standard is 'necessary,' we choose to adopt a definition of 'appropriate' that aligns with the more exacting term, 'necessary.' In the context of posttermination visitation, we read the word 'appropriate' to mean 'proper.' . . . '[T]here should be few cases in which court-ordered posttermination visitation could be deemed "necessary or appropriate to secure the [child's] welfare," ' particularly in light of the grounds on which a trial court can terminate parental rights. See General Statutes § 17a-112 (j). A more exacting standard is required in this context, particularly in light of the rare circumstance in which a trial court could simultaneously terminate parental rights and, in the same proceeding, order posttermination visitation. Mindful of these considerations, we conclude that the 'necessary or appropriate' standard is purposefully more stringent than the 'best interest of the child' standard, as the trial court must find that posttermination visitation is necessary or appropriate—meaning 'proper'—to secure the

child's welfare." (Citation omitted.) *In re Annessa J.*, supra, 343 Conn. 673–74.

"It is well settled that we review a trial court's exercise of authority under § 46b-121 (b) (1) for an abuse of discretion. *In re K. M.*, 217 Conn. App. 687, 702, 289 A.3d 1240 (2023). 'Whether . . . posttermination visitation [is necessary or appropriate] is, of course, a question of fact for the trial court, which has the parties before it and is in the best position to analyze all of the factors [necessary for a determination regarding posttermination visitation] . . . . Our dedicated trial court judges, who adjudicate juvenile matters on a daily basis and must make decisions that concern children's welfare, protection, care and support, are best equipped to determine the factors worthy of consideration in making this finding. As examples—which are neither exclusive nor all-inclusive—a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child.' . . . *In re Ava W.*, [supra, 336 Conn. 589–90].

"It is axiomatic that we review a trial court's factual determinations for clear error. 'A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling.' . . . *In*

*re Anthony S.*, 218 Conn. App. 127, 153, 290 A.3d 901 (2023). On review for clear error, 'the mere existence in the record of evidence that would support a different conclusion, without more, is not sufficient to undermine the finding of the trial court.' . . . *In re Anaishaly C.*, 190 Conn. App. 667, 682, 213 A.3d 12, cert. denied, 345 Conn. 914, 283 A.3d 505 (2019)." *In re L. T.*, 220 Conn. App. 680, 702–703, 299 A.3d 1229 (2023).

In the present case, in finding that a posttermination contact order was neither necessary nor appropriate to secure Nevaeh's welfare, protection, proper care and suitable support, the court took into consideration a number of the factors set forth by our Supreme Court in *In re Ava W.*, supra, 336 Conn. 589–90. Specifically, the court considered Nevaeh's wishes, not only that she was "open to" limited contact with the respondent through letters and phone calls, but also that she desired to be adopted by her foster mother; the respondent's expressed interest in having continued contact with Nevaeh following the termination of his parental rights and Nevaeh's adoption by her foster mother, which he supported; the fact that the respondent had abandoned Nevaeh when she was five years old and only reentered her life in 2023, at which time he was a virtual stranger to Nevaeh; and their monthly prison visits, which the court characterized as congenial, noting a few times when Nevaeh had opted out of attending the visits and her stated desire that she does not want posttermination, in person contact with the respondent. A few other factors, however, weighed heavily in the court's decision, namely, the respondent's status as a convicted child sex offender, Nevaeh's past history of physical and sexual abuse and emotional well-being, and how a posttermination contact order would affect Nevaeh's adoption prospects. For example, the court explained that the fact that the respondent is a convicted child sex offender, as well as "Nevaeh's past sexual and physical assault victimization, demand[ed] that posttermination

visitation/contact be scrupulously considered."[17] Of particular concern to the court was the potential harm that a posttermination visitation or contact order could have on "Nevaeh's emotional and physical well-being, or on her relationship with [her] foster mother, or on her future adoption possibilities," especially given that the foster mother was "steadfast" in her desire for a closed adoption, "adamantly object[ed] to any form of posttermination visitation/contact . . . involving [the] respondent," and might reconsider adoption if any such order were imposed. Given the foster mother's opposition to any posttermination contact between Nevaeh and the respondent, the court properly considered the potential negative impact that a posttermination contact order might have on Nevaeh's adoption prospects.

We find no merit to the respondent's contention that the court should have afforded "greater weight" to Nevaeh's wishes and the clinical evidence supporting continued contact between Nevaeh and the respondent. There is nothing in the decisions of our Supreme Court in *In re Ava W.*, supra, 336 Conn. 545, or *In re Annessa J.*, supra, 343 Conn. 642, suggesting that trial courts should elevate a minor child's wishes over any of the other factors considered by the court. The respondent acknowledges that there is no authority governing the degree of weight a court must afford to the particular factors it considers in deciding a motion for posttermination visitation, and we decline the respondent's request to impose any such requirement. Indeed, in *In re Ava W.*, our Supreme Court, in setting forth a nonexclusive list of factors that "a trial court *may* want to consider," expressly stated that trial court judges "are best equipped

---

[17]As the court noted in the portion of its decision addressing the termination petition: "Prior to the end of 2023, [the respondent] was a virtual stranger to Nevaeh. [The respondent] is a convicted child sex offender. What contact [the respondent] should have with Nevaeh needs to be clinically evaluated and the level of risk he poses when released back into the community needs to be determined, and needed safeguards, if any, put in place. . . . Given Nevaeh's tragic and repeated sexual victimization, it is critical that she be protected from further victimization of any kind." (Footnote omitted.)

to determine the factors worthy of consideration in making [the necessary or appropriate] finding." (Emphasis added.) *In re Ava W.*, supra, 589–90. It is not for this court to usurp the discretion afforded to a trial court in this context. The child's wishes are but one factor that a trial court *may*, but is not required to, consider. See *In re L. T.*, supra, 220 Conn. App. 704 ("Although the respondent loves the minor children and may have had frequent and positive interactions with them, that is just one factor that the court *may* consider in evaluating whether posttermination visitation is necessary or appropriate. It is not required to do so. Moreover, even if the court did consider the nature of the respondent's previous visitation with the minor children, and agreed with her that it was frequent and positive in nature, that determination, in itself, would not have been dispositive of the required inquiry of whether posttermination visitation was necessary or appropriate." (Emphasis in original.)).

"Insofar as the [respondent] invites us to reconsider the evidence that was before the court, [w]e note that it is not the function of this court to review the evidence to determine whether a conclusion different from the one reached could have been reached. . . . Thus, [a] mere difference of opinion or judgment cannot justify our intervention. . . . Likewise, it is not the province of this court to reweigh the evidence before the court or to substitute our judgment in this matter. *F. S.* v. *J. S.*, 223 Conn. App. 763, 794, 310 A.3d 961, cert. denied, 350 Conn. 903, 323 A.3d 344 (2024); see also *In re Blake P.*, 222 Conn. App. 693, 707, 306 A.3d 1130 (2023) ([a]lthough there may be evidence in the record that would support the [plaintiff's] position, it is not the role of [an appellate] court to examine that evidence and substitute our judgment for that of the trial court)." (Internal quotation marks omitted.) *Cardona* v. *Padilla*, 230 Conn. App. 534, 548, 330 A.3d 912 (2025).

Moreover, the respondent, in asserting his claim that greater weight should have been afforded to Nevaeh's

wishes—that she was "open to" limited contact with the respondent posttermination—ignores Nevaeh's other stated wishes and desire to be adopted by her foster mother, which adoption might be jeopardized if the court were to order posttermination visitation or contact between Nevaeh and the respondent. As the court noted in its decision: "Nevaeh's history of abuse, neglect and trauma is staggering and interventions to stabilize the situation are ongoing. The court notes that, if Nevaeh is not adopted by [her] foster mother, given Nevaeh's age, her ongoing need for a therapeutic level home environment, and her significant life struggles, the chances of her achieving adoption elsewhere are greatly diminished. The court reiterates that her current foster home is her third foster home and she has resided with her foster mother since May 2023."[18]

In short, the record does not support the respondent's claim that posttermination contact between the respondent and Nevaeh was necessary or appropriate to secure Nevaeh's welfare. See *In re Annessa J.*, supra, 343 Conn. 674. Although the respondent contends that the record contains evidence favoring his posttermination contact with Nevaeh, "without more, [that] is not sufficient to undermine the finding of the trial court." (Internal quotation marks omitted.) *In re L. T.*, supra, 220 Conn. App. 703. Accordingly, given that the necessary or appropriate standard is a stringent one; see *In re Annessa J.*, supra, 674 ("[a] more exacting standard is required in this context, particularly in light of the *rare circumstance* in which a trial court could simultaneously terminate parental rights and, in the same proceeding, order posttermination visitation" (emphasis added)); and that a court's determination as to whether posttermination visitation is necessary or appropriate is a factual one, in which we afford every reasonable presumption in favor of its correctness; see *In re L. T.*, supra, 703; we cannot conclude that the court erred in finding that a

---

[18]We note that, although the court made this statement in the portion of its decision addressing Felicia T.'s motion for posttermination visitation, it applies equally with respect to the respondent's motion.

posttermination contact order is not necessary or appropriate to secure Nevaeh's welfare, protection, proper care and suitable support. See *In re Ava M.*, 223 Conn. App. 590, 609, 309 A.3d 383, cert. denied, 348 Conn. 962, 312 A.3d 38 (2024); *In re L. T.*, supra, 704–705.

The judgment is affirmed.

In this opinion the other judges concurred.